659 P.2d 111

Donald H. LELIEFELD and Jewel H. Leliefeld, husband and wife, Nabisco, Inc., a corporation, Plaintiffs-Respondents, Cross-Respondents,

v.

Wendell JOHNSON, d/b/a Panorama Contractors, Inc., a/k/a Panoramic Construction; Johnnie L. Carnline, Defendants-Respondents, Cross-Appellants,

and

The State of Idaho, Defendant-Appellant, Cross-Respondent.

No. 12983.

Supreme Court of Idaho.

Feb. 18, 1983.

358

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Robert M. Tyler, Jr., of Elam, Burke, Evans, Boyd & Koontz, Boise, for defendant-appellant, cross-respondent.

Nick M. Lamanna of Cooke & Lamanna, Priest River, J. Donald Curran and Martin L. Salina of Delay, Curran & Boling, Spokane, Wash., for plaintiffs-respondents, cross-respondents.

Terry Lee Jensen of Jensen & Mills, Sandpoint, Stanley D. Moore of Winston & Cashatt, Spokane, Wash., for defendants-respondents, cross-appellants.

### ON DENIAL OF PETITION
### FOR REHEARING

DONALDSON, Chief Justice.

On April 9, 1975, a traffic accident occurred on the Lightning Creek Bridge on Idaho State Highway 200 near Clark Fork, Idaho. While·plaintiff-respondent Donald Leliefeld was driving east in his employer's truck, defendant-cross-appellant Johnnie Carnline was driving west in his employer's dump truck pulling a lowboy trailer loaded

with a D–6 Caterpillar bulldozer. The minimum width of Carnline's load was 9′2″ and the bulldozer blade extended beyond the right-hand edge of the trailer. At the time of the accident, I.C. § 49–913 provided that no vehicle using the Idaho highways could exceed eight feet in width without a permit from the state. Carnline had no permit.

A collision occurred on the bridge between the truck driven by Leliefeld and the bulldozer on Carnline's trailer. While the approach roadways were 22′ wide, the bridge, which was built in 1937, was 20′ wide from curb to curb. On neither the approaches nor the bridge were there warning signs concerning the bridge width. There was conflicting testimony as to which truck first entered the bridge. While crossing the bridge, the bulldozer blade caught on a bridge girder which caused the bulldozer to be displaced into the path of Leliefeld's oncoming truck. During the ensuing collision, Leliefeld was injured. Some time subsequent to the accident, warning signs were erected at this bridge.

The Leliefelds and his employer Nabisco brought suit against Carnline, and his employer Wendell Johnson, d/b/a Panorama Contractors, Inc., a/k/a Panoramic Construction, and the State of Idaho seeking to recover damages. The State answered and filed a cross-complaint against the other defendants Wendell Johnson, Panorama, and Carnline for damages to the bridge and for indemnity and contribution in the event the State was shown to be liable. In turn Carnline, Johnson, and Panorama filed a responsive pleading which counter-claimed against the Leliefelds and Nabisco for property damage and personal injuries to Carnline and cross-claimed against the State for damages and indemnity. Attorney fees were sought by all parties.

Prior to trial several motions *in limine* were made. Carnline, Johnson and Panorama moved for an order excluding all evidence that at the time of the accident they did not have a wide load permit. This was denied. The State moved for an order excluding all evidence of subsequent alterations made by the State to the bridge or the

state highway which passes over it. This was denied. The State also moved for partial summary judgment on the issues of alleged liability of the State as a result of the plan or design for construction of the Lightning Creek Bridge. This motion was granted.

A jury trial was conducted at which evidence consisting of several exhibits and testimony was introduced by Leliefeld that the signing of the bridge was substandard and that bridge design standards had changed over the years. The State objected to the evidence as to design standards as being contrary to the order granting partial summary judgment which objection was overruled. Evidence was admitted over the State's objection that the bridge was signed subsequent to the accident. A police accident report was admitted over objection. After a motion at the close of the evidence, the court dismissed defendant Johnson on grounds that there was insufficient evidence to establish any liability on his part, but denied motions to dismiss the other defendants.

The State requested a jury instruction on the State's discretionary function defense which was refused. However, the court did give, over objection, an instruction that the State may lose its design immunity if conditions change sufficiently to produce a "dangerous condition." Carnline and Panorama requested a jury instruction which would have excluded jury consideration of the fact that no wide load permit had been obtained. This was denied and the court gave, over objections, instructions that a permit was required by statute for vehicles greater than eight feet in width and that violation of such a statute is negligence "unless compliance ... was impossible or something over which the party had no control placed him in a position of violation of the statute or an emergency not of the party's own making caused him to fail to obey the statute."

A special verdict was returned by the jury in which negligence was attributed as follows: Leliefeld (10%), Carnline (65%) and the State (25%). The jury found damages

as follows: Donald H. Leliefeld ($400,000), Jewel H. Leliefeld ($20,000), and Nabisco ($13,946.82). Judgment was entered for Donald H. Leliefeld ($360,010.96), Jewel H. Leliefeld ($18,004.45), and Nabisco, Inc. ($12,536.73). Under I.C. § 6–926, the State subsequently moved to amend the judgment against the State to $100,000 plus costs. This motion was granted. The State's motion for judgment n.o.v. or a new trial and Carnline's and Panorama's motion for a new trial were denied. The State appeals and all other parties cross-appeal.

## I.

The first issue presented is whether the placing or nonplacing of signs at the bridge was a discretionary function within the meaning of the Idaho Tort Claims Act [ITCA]. If it was, then the State is immunized from liability. I.C. § 6–904(1) provided at times relevant to this controversy[1] that:

"EXCEPTIONS TO GOVERNMENTAL LIABILITY.—A governmental entity shall not be liable for any claim which: 1. Arises out of any act or omission of an employee of the governmental entity exercising due care, in the execution of a statute or regulation, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." 1974 Idaho Sess.Laws ch. 167, p. 1423.

We have considered this exemption from liability in three other cases—*McClure v. Nampa Highway District,* 102 Idaho 197, 628 P.2d 228 (1981), *Gavica v. Hanson,* 101 Idaho 58, 608 P.2d 861 (1980), and *Dunbar v.*

*United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980). In *McClure* and *Gavica,* we considered the application of the discretionary function exception with regard to actions which alleged negligence on the part of a governmental entity in maintaining or failing to warn of a known dangerous condition in or on a public highway. *McClure* and *Gavica* make it clear that the State is not immunized from liability when with respect to a public highway, the State maintains a known dangerous condition on the highway and fails to properly warn motorists of such a condition.

The State responds to *McClure* and *Gavica* by asserting that bridges are signed according to statewide standards promulgated by the Idaho Transportation Department. According to the State, the formulation of criteria governing the signing of bridges occurs at the state level and has no parallel in the private sector. The State directs our attention to plaintiffs' exhibit 58, a document delineating certain signs to be placed on various types of bridges. This document was formulated after four to five years of study by the state traffic engineer's office. The State argues that this is evidence that the decision to sign or not sign bridges is made at the state level for all of the bridges in this state and therefore has no parallel in the private sector. This would be cogent to our deliberations, if the theory upon which this case was tried was that these statewide signing and striping standards were inadequate, negligently promulgated or a cause of the accident. In such a case, the discretionary immunity accorded the State by I.C. § 6–904(1) would apply. However, this case was tried upon a different theory that this particular bridge

1. I.C. § 6–904(1) was amended in 1978. It now provides:

"Exceptions to governmental liability.—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which: "1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the

execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."

Even if applicable, this amendment would not affect our decision.

was dangerous at the time of the accident, that the State knew that it was a dangerous condition, and yet failed to correct the dangerous condition, either by reconstructing the bridge or by warning of its characteristics. We are not persuaded that *McClure* and *Gavica* were wrongly decided or should not be applied. The declaration and existence of statewide standards are not talismanic and do not provide immunity from liability for breach of a duty to make safe or warn of known dangerous conditions on public highways.

The State argues that in *Dunbar* the discretionary immunity afforded by § 6–904(1) was available because the state mine inspector was applying statewide mine safety standards and there was no similar duty imposed in the private sector. Here, the State argues that the responsible state highway engineer simply was implementing statewide standards for the construction and signing of bridges. There are several flaws in this argument. Here, unlike *Dunbar,* the standards apply only to the State's own highway system; there is no attempt to regulate the conduct of third parties. Second, the individual highway districts within the state can and do go beyond statewide standards when necessary to compensate for dangers unique to a particular portion of the state highway system. While the creation of a governing policy might well be discretionary, nonetheless, a negligent failure in the furtherance of that policy could well be tortious and outside the screen of immunity. Third, the State itself admits that the document which it relies on as proof that the signing of the bridge was a policy matter was not completed until after the accident. In part because it would be anomalous to permit the State to create immunity for itself simply by promulgating a statewide directive after an accident, we decline to bring the State under the aegis of I.C. § 6–904(1).

■ Finally, the State argues that the *Dunbar* test should be limited on its facts to the first clause of § 6–904(1) which concerns a statutory or regulatory function.

The mine inspector in *Dunbar* was performing a "regulatory function" and was thus immunized. The State argues that if the *Dunbar* test were applied to the second clause of § 6–904(1) which relates to a "discretionary function or duty," then the statute contains two clauses which provide the same thing and one would be "mere surplusage." The State would draw from its reading of the statute and *Dunbar* the conclusions that the "discretionary function" clause provides a broader scope of immunity than the "regulatory function" clause and that the parallel functions test should apply only to the first clause. While we agree with the State that the two clauses represent two separate types of actions which may be immune from liability, we see no reason for applying different tests. In *Dunbar,* we stated that "our legislature has intended that wherein tort liability would attach to a private person, a governmental entity engaging in the same conduct will be liable." *Dunbar, supra* at 546, 602 P. 2d at 44. We do not construe either clause as "mere surplusage." While fewer parallels may exist where a regulatory action is taken than when a discretionary action is taken, the test remains the same. *See McClure, supra; Gavica, supra.* I.C. § 6–904(1) does not immunize the State from liability for failing to properly sign the Lightning Creek Bridge under the theory of the suit.

## II.

The State next argues that it was error for the court to admit evidence of its signing of the bridge which occurred approximately one year after the accident.[2] The State's motion *in limine* to exclude any evidence concerning these signs was denied. As a result, during trial reference to the signs was made during plaintiffs' counsel's opening and closing arguments and a replica of the signs was introduced into evidence. There was also testimony that these signs were placed on the approaches to the bridge subsequent to the accident. A State

**2.** The erected signs read "One Lane Bridge for Trucks Buses."

request for a jury instruction forbidding the jury from drawing an inference of negligence from the subsequent signing was refused.

Idaho adheres to the general rule that evidence of post-accident repairs or alterations to show antecedent negligence is inadmissible. *E.g., Alsup v. Saratoga Hotel, Inc.,* 71 Idaho 229, 236–37, 229 P.2d 985, 990 (1951); *see also Mann v. Safeway Stores, Inc.,* 95 Idaho 732, 739, 518 P.2d 1194, 1201 (1974); G. Bell, Handbook of Evidence for the Idaho Lawyer 79–80 (2d ed. 1972); E. Cleary, McCormick's Handbook of the Law of Evidence § 275 (2d ed. 1972); G. Lilly, An Introduction to the Law of Evidence § 48 (1978); 2 Wigmore, Evidence § 283 (Chadbourn rev. 1979); Annot., 64 A.L.R.2d 1296 (1959). While in most cases the courts which follow this rule have not expressed the foundation for the rule,[3] we have previously stated that such evidence is excluded as immaterial. *See, e.g., Alsup v. Saratoga Hotel, Inc., supra; Giffen v. City of Lewiston,* 6 Idaho 231, 55 P. 545 (1898).

In denying the State's motion *in limine,* the trial court relied upon *Otts v. Brough,* 90 Idaho 124, 409 P.2d 95 (1965) and *Zenier v. Spokane International Railroad Co.,* 78 Idaho 196, 300 P.2d 494 (1956). In *Otts,* this Court considered an appeal from a grant of summary judgment. Plaintiff Otts had fallen through an opening in a floor at a construction site and later that opening was barricaded. The *Otts* Court expressed that

"[w]hile such evidence [of barricading] could not be introduced for the purpose of showing antecedent negligence on the part of respondent Brough, as the one in charge of the area for the purpose of the work there carried on, nevertheless it was material as bearing upon respondent's recognition of a defect which he was duty bound to remedy." *Otts, supra* at 135, 409 P.2d at 101.

This proposition was supported by citation to *Zenier v. Spokane International Railroad Co., supra.* In *Zenier,* suit was brought to recover damages for the loss of two horses.

The *Zenier* Court considered the admissibility of evidence that a fence was built after the loss occurred and stated that "such evidence was material, not for the purpose of showing antecedent negligence on appellant's part, but as evidence of appellant's recognition of a defect which it was bound to remedy . . . ." *Id.* at 203, 300 P. 2d at 498–99 (citations omitted). These cases do not persuade us that the evidence of post-accident signing of the Lightning Creek Bridge was permissible. Further, *Zenier* involved a statute which created strict liability for failure to guard against a defect. The evidence of the erection of the fence was material to whether a defect existed and there was no issue as to negligence involved. *Otts* and *Zenier* address exceptions to the general rule of inadmissibility and are not apposite here.

The rule was originally devised by courts which felt that such evidence was irrelevant to antecedent negligence. One of the first cases to address the issue was *Hart v. Lancashire & Yorkshire Ry. Co.,* 21 L.T.R.(n.s.) 261 (1869) (Bramwell, B.). There it was stated:

"People do not furnish evidence against themselves simply by adopting a new plan in order to prevent the recurrence of an accident. I think that a proposition to the contrary would be barbarous. It would be (as I have often had occasion to tell juries) to hold that, because the world gets wiser as it gets older, therefore it was foolish before." *Hart v. Lancashire & Yorkshire Ry. Co.,* 21 L.T.R.(n.s.) 261, 263 (1869), *quoted in* 2 Wigmore, Evidence § 283, at 184 (Chadbourn rev. 1979).

In analyzing the relevancy ground for exclusion, it is helpful to consider factors which mitigate the argument that under a liberal scheme of relevancy such evidence is admissible. Such a factor is the equal probability of an inference contrary to negligence being drawn from a subsequent remedial measure viz. a particularly prudent, circumspect and fastidious individual doing

---

**3.** E. Cleary, McCormick's Handbook of the Law of Evidence § 275, at 666 n. 9 (2d ed. 1972).

something which the law would not dictate needed to be done.[4] *See* Adv.Comm. Note to Fed.R.Evid. 407 ("[subsequent remedial measure] is not in fact an admission, since the conduct is equally consistent with injury by mere accident or through contributory negligence"); G. Lilly, An Introduction to the Law of Evidence § 48, at 150–51 (1978) ("An after-the-incident precautionary measure may reflect merely the exercise of extraordinary caution ... and may not indicate the actor's belief that the condition in question was really hazardous"). It would be unfair to penalize such an individual by permitting his conduct to be introduced as evidence of his negligence because it is clear that his act could be that done by a super-cautious man and not that required of a reasonable man. As Professor Lilly has written:

> "In negligence cases, liability attaches if the defendant acted unreasonably in view of the facts known (or which should have been known) to him before the incident in question. An after-incident remedial measure is usually taken on the basis of the additional facts revealed by the accident or injury. There is a risk that the trier, particularly a jury, might not keep this important distinction clearly in mind and might too easily infer prior knowledge from the subsequent remedial acts, which were generated by the knowledge learned from the incident itself." *Id.* at

152. *See also* 2 Wigmore, Evidence § 283, at 174–75 (Chadbourn rev. 1979).

■ In Wigmore, it is stated:

"If ... bridges ... never caused corporal injury except through the negligence of their owner, then his act of improving their condition, after the happening of an injury thereat, would indicate a belief on his part that the injury was caused by his negligence. But the assumption is plainly false; injuries may be, and constantly are, caused by reason of inevitable accident, and also by reason of contributory negligence of the injured person. To improve the condition of the injury-causing object is therefore to indicate a belief merely that it has been *capable of causing such an injury,* but indicates nothing more, and is equally consistent with a belief in injury by mere accident, or by contributory negligence, as well as by the owner's negligence. Mere capacity of a place or thing to cause injury is not the fact that constitutes a liability for the owner; it must be a capacity which could have been known to an owner using reasonable diligence and foresight, and a capacity to injure persons taking reasonable care in its use.

"On this ground, then, namely, that the supposed inference from the act is not the plain and most probable one, such acts of repair or improvement should be excluded.

4. In analyzing an example from Wigmore concerning subsequent repair of machinery involved in an accident, Professor James utilized a transmutation of a proposed direct inference into its deductive form to demonstrate its invalidity as suggested:

> "In the case of the repaired machinery we are told: ' "People who make such repairs [after an accident] show a consciousness of negligence; A made such repairs; therefore, A was conscious of negligence." ' Before this deductive proof can be evaluated, ambiguity must be eliminated from the major premise. By 'people' shall we understand 'some people' or 'all people'? If the argument is intended to read, 'Some people who make such repairs show consciousness of neglience [sic]; A made such repairs; therefore, A was conscious of negligence,' it contains an obvious logical fallacy. If intended

to read, 'All people who make such repairs show consciousness of negligence; A made such repairs; therefore, A was conscious of negligence,' it is logically valid. However, few could be found to accept the premise that *all* persons who repair machinery after an accident show consciousness of guilt; that is, that no single case could be found of one who, confident of his care in the past, nevertheless made repairs to guard against repetition of an unforeseeable casualty or to preserve future fools against the consequence of their future folly. Here the result of transmuting a proposed direct inference into deductive form is discovery that it is invalid— at least in the terms suggested." James, Relevancy, Probability and the Law, 29 Calif.L. Rev. 689, 696–97 (1941) (footnotes omitted) (emphasis in the original).

". . . [I]n the present instance an argument of policy has always been invoked to strengthen the case for exclusion. That argument is that the admission of such acts, even though theoretically not plainly improper, would be liable to overemphasis by the jury, and that it would discourage all owners, even those who had genuinely been careful, from improving the place or thing that had caused the injury, because they would fear the evidential use of such acts to their disadvantage; and thus not only would careful owners refrain from improvements, but even careless ones, who might have deserved to have the evidence adduced against them, would by refraining from improvements subject innocent persons to the risk of the recurrence of the injury.

"Whatever then might be the strength of the objection to such evidence from the point of view of relevancy alone, the added considerations of policy suffice to make clear the impropriety of resorting to it." *Id.* (Emphasis in the original.)

There are at least four other instances where otherwise relevant evidence may be rendered inadmissible—where the probative value is overshadowed by (1) the danger that it may unduly arouse the jury's emotions, (2) the likelihood that it may distract the jury from the main issues, (3) the inordinate consumption of time during its presentation, and (4) the danger of unfair surprise. E. Cleary, McCormick's Handbook of the Law of Evidence § 185, at 439–40 (2d ed. 1972).

At the turn of the century, an alternative ground for exclusion, which the State now advances, began to supplant the lack of relevancy as a basis for exclusion. This alternative is the social policy to encourage people to take action after an incident to further safety without the fear that such action could later be used to show their negligence. *See, e.g., City of Niceville v. Hardy,* 160 So.2d 535 (Fla.Dist.Ct.App. 1964); *City of Newport v. Maytum,* 342 S.W.2d 703 (Ky.1961); *Lea v. Baumann Surgical Supplies, Inc.,* 321 So.2d 844 (La. App.1975), *cert. denied,* 325 So.2d 279 (La. 1976); *Hull v. Enger Construction Co.,* 15

Wash.App. 511, 550 P.2d 692, 697 (1976); *see generally* E. Cleary, McCormick's Handbook of the Law of Evidence § 275 (2d ed. 1972); G. Lilly, An Introduction to the Law of Evidence § 48 (1978); 2 Wigmore, Evidence § 283 (Chadbourn rev. 1979); Annot., 64 A.L.R.2d 1296 (1959). While we have never expressly embraced this rationale, neither have we rejected it. We continue to perceive a real or potential benefit as flowing from the rule which excludes evidence of subsequent remedial measures with respect to the issue of antecedent negligence.

■ From our review of the record and the law, we conclude that the admission of this evidence of post-accident signing of the Lightning Creek Bridge constitutes reversible error.

### III.

The next issue presented is whether the court erred in admitting evidence of bridge construction standards promulgated after Lightning Creek Bridge was constructed. It is uncontested that the bridge was constructed in conformance with the standards applicable in 1937. The trial court granted the State's motion for partial summary judgment and excluded "the plan or design for construction of the Lightning Creek Bridge" as an issue in the case. This ruling was based on I.C. § 6–904(8).

■ The State argues that the admission of evidence of post-construction standards and the giving of the following quoted instruction are contrary to I.C. § 6–904(8) and constitute reversible error. We agree.

During the trial, the plaintiffs were allowed, over the State's objection, to introduce evidence of subsequently promulgated bridge design standards and evidence that the Lightning Creek Bridge did not conform to these standards. Plaintiffs presented expert testimony that the bridge was substandard when compared to these later promulgated design standards and that it deviated from these standards in that it was narrower than the width that

these standards dictated. It was argued that this evidence was used for the purpose of proving that the State knew, or should have known that the bridge was potentially hazardous in light of other evidence which indicated that there had been a substantial increase in the amount, speed and type of traffic using the bridge since it was first constructed; that there had been several other accidents and frequent collision damage to this particular bridge; that the State was aware of these accidents and the frequency of collisions; and that the bridge had been placed on priority "A" for replacement due in part to "vertical clearance restriction and width." In short, the plaintiffs' theory below was that the change in traffic conditions on the bridge since 1937 made what may once have been a safe bridge unsafe and that the State was put on notice of the hazardous nature of the bridge by (1) its knowledge of changing standards for such bridges, (2) its knowledge of changes in traffic flow conditions, and (3) its knowledge of accidents at and frequent collisions with the bridge. After the parties presented their cases, the court instructed the jury that:

> "[T]he immunity from liability on the part of a public entity, which was heretofore read to you, is not necessarily permanent or perpetual. The immunity granted by that law may disappear if and when conditions have changed. Where a plan or design, properly approved and prepared in conformity with standards in effect at the time of construction, in its actual operation under changed physical conditions produces a dangerous condition of which the public entity has notice, and proximately causes injury, the public entity does not retain such immunity.
>
> "Once the public entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act with ordinary care to protect against the danger. Such notice may be actual or constructive, and must be a sufficient time prior to the injury to have permitted the public entity to take measures to protect against the danger."

Under I.C. § 6–904(8), *infra* note 7, the question becomes whether § 6–904(8) was intended by the legislature to perpetually immunize the State from liability arising out of plans or designs for, among other things, bridges. This case presents the first occasion for judicial construction of I.C. § 6–904(8).

▬ In construing a statute, this Court attempts to discern and implement the intent of the legislature. In performing this function, courts variously seek edification from the statute's legislative history, examine the statute's evolution through a number of amendments, and perhaps seek enlightenment in the decisions of sister courts which have resolved the same or similar issues. *See, e.g., Odenwalt v. Zaring,* 102 Idaho 1, 5, 624 P.2d 383, 387 (1980); *Nixon v. Triber,* 100 Idaho 198, 595 P.2d 1093 (1979). Another method, we have employed is to examine the purposes of the act and its structure as a whole in an attempt to discern the legislative intent behind the statute. *See Janss Corporation v. Board of Equalization of Blaine County,* 93 Idaho 928, 478 P.2d 878 (1970); *Jackson v. Jackson,* 87 Idaho 330, 393 P.2d 28 (1964).

In part, because a legislative history of this provision is nonexistent and the evolution of the statute is unrevealing, we will consider decisions rendered by courts of other jurisdictions which have encountered similar questions.

Design immunity statutes are relatively rare among the various state tort claims acts. Thus, most of the cases focus instead on state liability for design defects under the discretionary immunity statute. *See, e.g., Johnson v. State,* 636 P.2d 47 (Alaska 1981). Idaho became one of the few states with a design immunity statute when the legislature in 1971 enacted what is currently I.C. § 6–904(8).

California in 1963 appears to have been the first state to enact a design immunity statute (current version Cal. Gov't. Code § 830.6 (West 1980)) based upon the stan-

dards as of the time of construction.[5] In first construing § 830.6, the California Supreme Court held that passage of time and change of conditions did not diminish the immunity granted by the statute. *Becker v. Johnston,* 67 Cal.2d 163, 60 Cal.Rptr. 485, 430 P.2d 43 (1967), *Cabell v. State,* 67 Cal.2d 150, 60 Cal.Rptr. 476, 430 P.2d 34 (1967). In *Cabell* a glass door had been originally designed in accordance with the then contemporary standards. A student injured by the door was not permitted to sue the State for defective design even though other students had been previously injured on the same door and even though the then current design standards called for a different type of glass. In *Becker* a highway intersection was designed in 1927 and completed in 1929. A motorist injured in a 1963 accident was held to have no cause of action against the State even though under changing conditions the intersection was not designed in accordance with engineering standards of the 1960's, and even though the intersection had been the scene of numerous accidents. In neither *Cabell* nor *Becker* did the plaintiff present as a theory of liability a failure of a duty to warn.

In 1965, Illinois became the next state to adopt some sort of specific design immunity when it enacted Chapter 85, § 3–103. This section expressly provides that the immunity shall not continue if the condition turns out to be unsafe.[6]

■ On March 20, 1971, our legislature enacted the next design immunity statute. 1971 Idaho Sess. Laws, ch. 150, § 4(7), p. 743, 746 (current version at I.C. § 6–904(8)).[7] At that time it had available for its consideration the California and Illinois statutes. From the striking similarity of language between the Idaho and California statutes, *compare* I.C. § 6–904(8) *with* Cal. Gov't.Code § 830.6, we conclude that our legislature chose to enact a version more like the California statute. By 1971, the California Supreme Court had already construed its statute to provide for perpetual

---

**5.** In 1963 Cal.Gov't.Code § 830.6 provided:
"Plan or design of construction of, or improvement to, public property. Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." 1963 Cal. Stat. ch. 1681, § 1, p. 3272.

**6.** The Illinois statute provided:
"(a) A local public entity is not liable under this Article for an injury caused by the adoption of a plan or design of a construction of, or an improvement to public property where the plan or design has been approved in advance of the construction or improvement by the legislative body of such entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved. *The local public entity is liable, however, if after the execution of such plan or design it appears from its use that it has created a condition that it is not reasonably safe.*
"(b) A public employee is not liable under this Article for an injury caused by the adoption of a plan or design of a construction of, or an improvement to public property." Ill.Ann.Stat. ch. 85, § 3–103 (Smith-Hurd 1966) (emphasis added).

**7.** The Idaho design immunity provision relevant to this cause provided:
"A governmental entity shall not be liable for any claim which:
. . . .
"8. Arises out of a plan or design for construction or improvement to the highways, roads, streets, bridges, or other public property where such plan or design is prepared in conformity with standards in effect at the time of construction previously approved in advance of the construction or approved by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval." 1974 Idaho Sess. Laws ch. 167, p. 1423.
The operative language remains unchanged from that first enacted in 1971. 1971 Idaho Sess.Laws ch. 150, § 4(7), p. 743, 746.

immunity. *Cabell v. State, supra; Becker v. Johnston, supra.* Later in *Baldwin v. State,* 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121 (1972), the California Supreme Court reversed its holding and held that changed conditions will dissolve the design immunity. Because the *Baldwin* decision which overruled *Cabell* and *Becker* came almost a year after our legislature acted, we choose to construe our statute as the California statute was construed at the time our legislature acted. Therefore, we hold that the legislature intended perpetual design immunity.

The construction we place upon § 6–904(8) does not preclude a finding of liability founded upon a failure to warn of a dangerous condition. *McClure, supra; Gavica, supra.*

Any evidence of what subsequent design standards called for in mandating bridge widths is at odds with the clear language of I.C. § 6–904(8) and cannot be properly admitted. In view of our holding that § 6–904(8) provides for perpetual immunity, the instruction given was error.

## IV.

■ Respondents cross-appellants Johnnie Carnline and Panoramic Contractors, Inc. argue that the trial court erred in admitting into evidence the investigating officer's report of the accident. Relevant to this issue is I.C. § 49–1511, which provides:

"Neither the report required by section 49–1504, Idaho Code, the action taken by the director pursuant to this act, the findings, if any, of the director upon which such action is based, nor the security filed as provided in this act shall be referred to in any way, nor be any evidence of the

negligence or due care of either party, at the trial of any action at law to recover damages." [8]

The trial court, in admitting the officer's report, relied in part on *Bell v. O'Connor Transport Limited,* 94 Idaho 406, 489 P.2d 439 (1971). In *Bell* without addressing I.C. § 49–1511, this Court held that such reports were admissible as "official reports" under I.C. § 9–316. Here, none of the parties directed the trial court's attention to I.C. § 49–1511. Subsequent to the trial in the instant case, we overruled *Bell. Owen v. Burcham,* 100 Idaho 441, 599 P.2d 1012 (1979). "[T]he intent of our legislature in the enactment of I.C. § 49–1511 was to restrict the utilization of reports of investigating officers following motor vehicle accidents." *Id.* at 444, 599 P.2d at 1015. We noted several reasons for excluding such reports—that they may contain extensive hearsay, conclusions and speculations of the officer, criminal charges made, and other materials otherwise inadmissible. *Id.* at 445, 599 P.2d at 1016.

While the trial court did not have the benefit of *Owen,* if it had been presented with a proper objection based upon. I.C. § 49–1511, the trial court would have erred by admitting the officer's report into evidence. In the particular setting of this case, the admission of the report was not reversible error as to the appellants Carnline and Panoramic. The appellants have the burden of demonstrating that prejudicial error occurred, *see Obray v. Mitchell,* 98 Idaho 533, 567 P.2d 1284 (1977); I.R.C.P. 61, and that burden has not been met. Officer Bruce testified prior to the admission of the report and his testimony covered virtually every aspect of the report. No objection

---

8. I.C. § 49–1504 provides in part:

"Report of accident required.—The accident report required by section 49–1007, Idaho Code, shall contain information to enable the director to determine whether the requirements for the deposit of security under section 49–1505, Idaho Code, are inapplicable by reason of the existence of insurance or other exceptions specified in this act."

I.C. § 49–1007(c) (as effective at the time of the accident) provided in part:

"(c) Every law enforcement officer, including county and municipal officers, who, in the regular course of duty, investigates a motor vehicle accident ... either at the time of and at the scene of the accident or thereafter by interviewing participants or witnesses shall, within 24 hours after completing such investigation, forward a written report of such accident to the department." 1969 Idaho Sess.Laws ch. 51, § 2, p. 141.

was made to Officer Bruce's personal testimony which contained several references to the report. The report was largely duplicative of admissible and admitted evidence. If error, it was harmless error. However, because the case must be retried as to liability, our holding in *Owen v. Burcham, supra,* could have application.

### V.

We turn next to the contention of Carnline and Panoramic that the trial court erred in admitting evidence that Carnline had not obtained a wide load permit from the state pursuant to I.C. § 49–913 prior to transporting the bulldozer involved in the accident.[9] Carnline and Panoramic admit that no permit for this load was obtained and that the load width was such as to require a permit under the statute.[10] The general rule in Idaho is that the violation of an applicable statutory prohibition constitutes negligence *per se. Kinney v. Smith,* 95 Idaho 328, 508 P.2d 1234 (1973); *Riley v. Larson,* 91 Idaho 831, 432 P.2d 775

(1967). Even though violation of a statute enacted for public safety is negligence *per se,* the violation must also be a proximate cause of the injury complained of in order to constitute actionable negligence. *E.g., Caldwell v. Tremper,* 90 Ariz. 241, 367 P.2d 266 (1962); *Sielsky v. Johnson,* 506 P.2d 381 (Colo.App.1973); *Plains Transport of Kansas, Inc. v. King,* 224 Kan. 17, 578 P.2d 1095 (1978); *Noland v. Sears, Roebuck & Co.,* 207 Kan. 72, 483 P.2d 1029 (1971); *see, e.g., Kinney v. Smith, supra.* They maintain that the absence of a permit could not have been a proximate cause of the accident. We disagree.

"Proximate cause is generally an issue for the jury unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." *Schaefer v. Elswood Trailer Sales,* 95 Idaho 654, 656, 516 P.2d 1168, 1170 (1973). Recognizing this rule, Carnline and Johnson correctly cast their argument in terms of sufficiency of the evidence; they argue that plaintiffs' offered no evidence

---

**9.** I.C. § 49–913 at the time of the trial provided in part that:

"A. No vehicle shall exceed a total outside width including any load thereon, of eight and one-half (8½) feet . . . .

. . . .

"G. Notwithstanding any other provision of this section, the total outside width of any vehicle using the interstate system in this state may not exceed eight (8) feet, except as permitted by section 49–905, Idaho Code." 1977 Idaho Sess.Laws ch. 119, p. 255.

I.C. § 49–905 at the time of the accident and of the trial provided:

"PERMITS FOR HEAVIER OR WIDER LOADS.—Upon application in writing to the Idaho transportation board or other proper authorities in charge of, or having jurisdiction over a public highway, such board or authorities may in their discretion issue a special permit to the owner or operator of any vehicle allowing heavier or wider loads than permitted by law to be moved or carried over and on the public highways and bridges. . . . Such special permits shall be in writing and may limit the time of use and operation over the particular highways and bridges which may be traversed and may contain such special conditions and require such undertaking or other security as the said Idaho transportation board or other proper authority shall deem to be necessary to protect the public highways and bridges

from injury, or provide indemnity for any injury to said public highways and bridges or to persons or property resulting from such operation. All such special permits shall be carried in the vehicles to which they refer and shall upon demand be opened to the inspection of any peace officer, any authorized agent of the Idaho transportation board or any officer or employee charged with the care or protection of the public highways. It shall be unlawful for any person to violate, or to cause or permit to be violated, the limitations or conditions of such special permits and any such violation shall be deemed for all purposes to be a violation of the provisions of this chapter." 1974 Idaho Sess.Laws ch. 12, § 75, p. 109.

**10.** While the trial should have been conducted utilizing I.C. § 49–913 as effective at the time of the accident, 1974 Idaho Sess.Laws ch. 168, p. 1424, the error entailed here by using an incorrect version is not fundamental. I.C. § 49–913 at the time of the accident provided in part:

"A. No vehicle shall exceed a total outside width including any load thereon, of eight (8) feet . . . ."

Since no party raised an objection to the use and the error is not fundamental, we consider this error to have been waived.

that failure to obtain a permit was a proximate cause of the accident. They suggest that evidence showing that a permit would have required the bulldozer to be moved at a different time, or along a different route, or under different conditions, would have established a causal link between the lack of a permit and the accident, but that in the absence of such evidence that it is impossible to find such a link. They claim therefore that admission of evidence of the violation of the statute was irrelevant and error. We disagree.

Plaintiffs submitted evidence that wide loads such as Carnline's are commonly flagged, that a permit would probably have required flagging, but that no flagging was present on the bulldozer at the time of the accident.[11] While the question of flagging was contested by Carnline and Panoramic, plaintiffs' evidence was sufficient to submit the question of a permit requirement and noncompliance therewith to the jury, and to allow the jury to draw the inference that the accident might not have happened if a permit had been obtained. Plaintiffs' evidence shows that (1) they were within the class of persons that the statute was designed to protect, (2) Carnline and Panoramic were within the class of people upon whom the statute imposed its duty, and (3) the harm suffered was the type which the statute was designed to prevent. *See Kinney v. Smith, supra.* Plaintiffs also pleaded and introduced substantial evidence of negligence, including causality, separate and apart from violation of the statute.

Evidence of the statutory violation was cumulative on the negligence issue. The jury was properly instructed on proximate cause and was fully aware that proof of causality is a prerequisite to recovery. We find no reversible error in the admittance of evidence that no permit was obtained.

## VI.

The State, and Carnline and Panoramic, each advance additional arguments that the evidence clearly shows that the sole cause of the accident was the negligence of a party or parties other than itself. The resolution of questions of negligence and proximate cause made by the trier of fact, if supported by substantial and competent evidence, will not be set aside on appeal. *Mann v. Gonzales,* 100 Idaho 769, 770, 605 P.2d 947, 948 (1980). We have carefully reviewed the record and are convinced that the jury could properly draw the conclusions which it did from the evidence presented.

Carnline and Panoramic next argue that the trial court's admission into evidence of Leliefeld's prosthetic leg and photographs of his injuries was error. They argue that this evidence was intended solely to inflame the passions of the jury and had no probative value. The admission of prosthetic devices and photographs of injuries is in the first instance a matter for the discretion of the trial judge. *See* 29 Am.Jur.2d *Evidence* § 772 (1967); Annot., 83 A.L.R.2d 1271, 1272 (1962).

> "The exhibition of an injury to a jury is within the discretion of the Trial Court, —a party may demonstrate the nature and extent of the injury, or the disability resulting therefrom, and it is common

11. The Idaho State Department of Transportation's Special Permit Regulations § 914.4 state:

> "*Red Flags to Mark Oversize Loads*
> "The traveling public *shall be protected* by marking the extremities of oversize vehicles or loads with warning flags. The color of such flags shall be plain red with no wording, emblem, symbol or insignia inscribed thereon and shall be in good condition with a minimum size of 18 by 18 inches. The location of the red flags shall be as follows:
> Front—Fastened to each front corner of the vehicle or load.

> Rear—Fastened to each corner at the rearmost part of vehicle or load at a height of seven (7) feet above the highway surface or at the top of the load, whichever is greater. Side—Fastened to mark any extremity of size or at the widest part." (Emphasis added.)

We also note that the Department's Special Permit Regulations § 914.5 state that "[f]lagmen shall be required at particular locations on a route of travel where a hazard to traffic will be created by the overlegal vehicle or load, such as: ... Overwidth—When crossing narrow bridges."

and correct practice to exhibit the wound or injury to the jury, even where there is no dispute as to the fact and nature of the injury.... Permitting the plaintiff to exhibit the stump of his amputated leg is within the sound discretion of the Court, even where the injury is fully described otherwise, and only if there be an abuse of such discretion manifestly prejudicing the defendant would such be reversible error.... The possibility that the demonstration may be unpleasant or gruesome is not determinative, but should be considered and weighed against the possible usefulness to the jury." *Darling v. Charleston Community Memorial Hospital,* 50 Ill.App.2d 253, 200 N.E.2d 149, 185 (1964) (citations omitted), *aff'd,* 33 Ill.2d 326, 211 N.E.2d 253 (1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966).

It is evident from the record that the trial court felt that the prosthesis and the photographs were relevant to the claims of plaintiffs and would aid the jury in understanding the nature, extent, and enduring consequences of the injuries suffered. We find no abuse of discretion in admitting this evidence.

▮ Carnline and Panoramic also argue that references to a dollar value of the general damages claimed by Leliefeld during his counsel's closing argument were contrary to I.C. § 10–111 [12] and constitute error. No objections were made at the time

that these references occurred; therefore, the objections even if valid were waived by not being advanced. *Koch v. Elkins,* 71 Idaho 50, 225 P.2d 457 (1950); *Hall v. Boise Payette Lumber Co.,* 63 Idaho 686, 125 P.2d 311 (1942).

## VII.

Donald Leliefeld argues that the trial court erred in reducing the amount of damages for which the State was liable to him from $360,010.96 to $100,000. Leliefeld argues that the statute under which the court acted, I.C. § 6–926, violates the equal protection clause of the fourteenth amendment to the United States Constitution [13] and article I, section 2 of the Idaho Constitution [14] by discriminating against a class of severely injured tort victims. An *amicus curiae* brief submitted by the Idaho Trial Lawyers Association also addresses the constitutionality of I.C. § 6–926.

I.C. § 6–926 was enacted in 1971 as part of the Idaho Tort Claims Act, 1971 Idaho Sess. Laws ch. 150, p. 743. At that time it provided in part:

"If any judgment or claim against a governmental entity under this act exceeds the one hundred thousand dollars ($100,000) per person limited to three hundred thousand ($300,000) in any one (1) accident where two (2) or more persons have claims or judgments on account of personal injury or death, the court

---

12. I.C. § 10–111 provides:

"Amount sought for damages not disclosed to jury.—In any civil action for damages, the amount of general damages sued for shall not be disclosed to the jury by court, counsel or any party and it shall be grounds for mistrial for any person to violate the prohibition of this act whether by specific statements or generalized argument. In furtherance of the provisions of this act it is declared that it is the exclusive province of the jury in a civil action for money damages involving allegations of general damages to resolve such issues of fact and it is against the policy of the state of Idaho for the jurors required to make such determinations to be informed of the particulars of allegations of damages in the pleadings on file with the court, by the arguments of counsel or otherwise, the dollar amount appraisal or evaluation of such dam-

ages being the exclusive province of the trier of fact; provided, this act shall not be construed to prohibit proof of damages or presentation of arguments which are legally relevant and proper in view of the record and issues before the court in any action for money damages."

13. "[N]or shall any state ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

14. "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature." Id. Const. art. 1, § 2.

shall reduce the amount to the minimum requirement unless the governmental entity has secured insurance coverage in excess of the minimum requirement. In this event the court shall reduce the amount of the claim or judgment to a sum equal to the applicable limits provided in the insurance policy."

Subsequently the section was amended in 1976 and repealed and replaced by a new provision in 1978.[15]

 When the constitutionality of a statute is challenged on grounds that it denies equal protection, the first question to address is what standard of review is to be applied. Three standards of equal protection analysis have been recognized in Idaho: strict scrutiny, means-focus, and rational basis. *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). If the classification involves either a fundamental right or a suspect class, then it is subjected to "strict scrutiny"—to justify the classification the state bears the heavy burden to demonstrate a "compelling state interest." Here, "strict scrutiny" is inapplicable as the alleged discrimination neither affects a fundamental right nor creates a suspect class. The next standard, "means-focus" examines the means specified in the legislation and searches for a "fair and substantial relation" between the means selected and the articulated and otherwise legitimate purpose of the legislation. This is less stringent than "strict scrutiny," but more stringent than the traditional "rational basis" test under which "a state statute is to be upheld against equal protection

attack if it is rationally related to the achievement of legitimate governmental ends." *G.D. Searle & Co. v. Cohn,* 455 U.S. 404, 408, 102 S.Ct. 1137, 1141, 71 L.Ed.2d 250 (1982); *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). A party who assails the constitutionality of a statute bears the burden of showing its invalidity and must overcome a strong presumption of validity. *E.g., Standlee v. State,* 96 Idaho 849, 538 P.2d 778 (1975); *Western Beverage, Inc. v. State,* 96 Idaho 588, 532 P.2d 930 (1974). The invalidity must be clearly shown. *Stucki v. Loveland,* 94 Idaho 621, 495 P.2d 571 (1972).

In choosing between the "means-focus" and "rational basis" tests, we find continuing merit in the following language from *Jones:*

"In the usual and ordinary case where a statutory classification is to be tested in the context of equal protection, judicial policy has been, and continues to be, that the legislation should be upheld so long as its actions can reasonably be said to promote the health, safety and welfare of the public. Nevertheless, where the discriminatory character of a challenged statutory classification is apparent on its face and where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute, then a more stringent judicial inquiry [means-focus] is required beyond that mandated by McGowan [rational basis]." *Jones, supra* 97 at 871, 555 P.2d at 411.

15. All of the versions of I.C. § 6–926 established a limitation on recovery. The version used in the trial court, reflecting the second amendment of 1976, 1976 Idaho Sess.Laws, ch. 310, p. 1069, while technically the wrong version to use did contain the $100,000 limitation which is at the root of the issue of constitutionality under our equal protection analysis.

"If any judgment or claim against a governmental entity or its employee under this act exceeds the one hundred thousand dollars ($100,000) per person limited to three hundred thousand dollars ($300,000) in any one (1) accident where two (2) or more persons have claims or judgments on account of per-

sonal injury or death, the court shall reduce the amount to the minimum requirement unless the governmental entity has provided liability coverage in excess of the minimum requirement. In this event the court shall reduce the amount of the claim or judgment to a sum equal to the applicable limits provided in the insurance policy or provided under the comprehensive liability plan." 1976 Idaho Sess.Laws ch. 310, p. 1069.

For purposes of this decision, the amendments and the current I.C. § 6–926 are substantively equivalent. We are concerned with whether the State may limit its tort liability.

While it is urged by Leliefeld and the *amicus* that the appropriate standard to be applied here is the "means-focus" standard which was first explicated in Idaho by our decision in *Jones v. State Board of Medicine, supra,* we are unconvinced.

The opinion in *Jones* explains that the "means-focus" standard is to be applied when a two-part trigger has been satisfied. The statute must be discriminatory on its face and there must be "a patent indication of a lack of relationship between the classification and the declared purpose of the statute. . . ." *Id.* at 871, 555 P.2d at 411. The State has articulated that the purpose of the recovery limitation is the protection of the public treasury which purpose was recognized by the trial court. It is argued that the limitations are an integral and central part of the comprehensive risk management program devised by the State to avoid excess liability and thereby preserve the public treasury. The enactment of the limitation provision is an attempt to balance the competing interests of a tort plaintiff to recover fully against the public interest in maintaining fiscal integrity. Without deciding the discriminatory effect of the recovery limitation, we hold that there exists a valid relationship between the limitation and the avowed purpose of the statute which is to protect the public coffers. Therefore, we decline to apply the "means-focus" standard and will utilize the "rational basis" test in our equal protection analysis. *See, e.g., Twin Falls Clinic & Hospital Building Corporation v. Hamill,* 103 Idaho 19, 644 P.2d 341 (1982); *Heese v. A & T Trucking,* 102 Idaho 598, 635 P.2d 962 (1981); *LePelley v. Grefenson,* 101 Idaho 422, 614 P.2d 962 (1980).

Under the "rational basis" test which is generally appropriate to use when reviewing statutes which impact social or economic areas,[16] the question becomes whether the classification "advances legitimate legislative goals in a rational fashion." *Schweiker v. Wilson,* 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1981); *Idaho Department of Employment v. Smith,* 434 U.S. 100, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977); *Twin Falls Clinic & Hospital Building Corporation v. Hamill, supra.* Although sparse the legislative history indicates that the legislature was aware that they were establishing a classification and did so deliberately and not as a result of accident or ignorance. We deem it logical to infer from the legislative intent to enact the recovery limitation and the State's purported objective to protect the public coffers which the plaintiffs concede is a reasonably conceived objective that the recovery limitation has a rational basis. We conclude that the recovery limitations of I.C. § 6–926 are not unconstitutional.

Leliefeld additionally argues that the passage of the Idaho Tort Claims Act affected an existing right. We disagree. Prior to our decision in *Smith v. State,* 93 Idaho 795, 473 P.2d 937 (1970), sovereign immunity was the rule as part of the common law. *Smith* announced that its holding which abrogated sovereign immunity would "govern all future causes of action arising on or after 60 days subsequent to the adjournment of the First Regular Session of the Forty-First Idaho State Legislature unless legislation is enacted at that session with respect to the abolition of the sovereign immunity of the state." *Id.* at 808, 473 P.2d at 950. The legislature responded to *Smith* with the passage of the comprehensive Idaho Tort Claims Act in 1971 and therefore the ITCA and not the prior judicial decision abrogated the doctrine of sovereign immunity. *Haeg v. City of Pocatello,* 98 Idaho 315, 563 P.2d 39 (1977); *Newlan v. State,* 96 Idaho 711, 535 P.2d 1348 (1975). Prior to the abrogation of the sovereign

**16.** "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Danridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed.2d 369 (1911)).

immunity doctrine, generally no right of recovery existed. The right to recover from the State is statutory and is analogous to the statutory cause of action which we reviewed in *Stucki v. Loveland,* 94 Idaho 621, 495 P.2d 571 (1972) (recovery limitation on survival actions constitutional under equal protection analysis). The ITCA provided a right of recovery and did not affect an existing right.

■ So long as the statute is constitutional, we have no intrinsic ability to review its inherent wisdom or, if it seems unwise, the power to change it. Whenever lines are drawn by legislation, some may seem unwise, but the responsibility for drawing these lines rests with the legislature and judicial review is limited.[17] *See, e.g., Schweiker v. Wilson,* 450 U.S. 221, 232–235, 101 S.Ct. 1074, 1082–83, 67 L.Ed.2d 186 (1981); *Haeg v. City of Pocatello,* 98 Idaho 315, 318, 563 P.2d 39, 42 (1977); *Newlan v. State,* 96 Idaho 711, 716, 535 P.2d 1348, 1353 (1975); *Estate of Cargill v. City of Rochester,* 119 N.H. 661, 406 A.2d 704, 708 (1979). We agree with the sentiments expressed by other courts which have urged their legislatures to periodically review their statutory provisions which limit tort recoveries. *E.g., Jetton v. Jacksonville Electric Authority,* 399 So.2d 396, 399 (Fla.Dist.Ct.App.1981); *Estate of Cargill v. City of Rochester,* 119 N.H. 661, 406 A.2d 704, 709 (1979), *appeal dismissed,* 445 U.S. 921, 100 S.Ct. 1304, 53 L.Ed.2d 754 (1980); *Sambs v. City of Brookfield,* 97 Wis.2d 356, 293 N.W.2d 504, 510, *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980).

17. "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Electric Co. v. Coleman,* 277 U.S.

■ Leliefeld argues that I.C. § 6–926[18] would where more than one person is making a claim permit a recovery of up to $300,000 to any one person. We disagree. From the language of the statute and its legislative history,[19] we conclude that the legislature intended to limit recovery to one person arising from personal injury or death to $100,000 unless the governmental entity had secured insurance coverage in excess of that amount.

### VIII.

All plaintiffs assign as error the failure of the trial court to award them attorney fees and certain costs. Since we are reversing and remanding for retrial on the issue of liability, these assignments need not be addressed.

■ The quantum of damages awarded by the jury is adequately supported by the record. Because we find no reversible error with respect to the determination of damages and we consider the damages severable from the liability issue, we affirm that determination. *Ferbrache v. Dillon,* 100 Idaho 317, 319–20, 597 P.2d 40, 42–43 (1979); I.R.C.P. 59(a); *see also Kitto v. Gilbert,* 39 Colo.App. 374, 570 P.2d 544 (Colo.App.1977); *Smith v. Lumbermen's Mutual Casualty Co.,* 360 So.2d 1098 (Fla. App.1978); Annot., 34 A.L.R.2d 988 (1954).

No costs allowed.

We affirm in part and reverse in part and remand for further proceedings in accordance with this opinion.

32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928) (Holmes, J., dissenting).

18. Leliefeld's argument is based on I.C. § 6–926(b) which was not applicable to this cause of action. Its applicable precursor, 1971 Idaho Sess.Laws ch. 150, § 26, p. 743, 749, is what we interpret.

19. The Legislative Council Committee on Tort Claims reported on August 15, 1968, that:

"Liability on the part of a government entity shall be limited to $100,000 per person, $300,000 per incident, and $100,000 property damage per incident."

McFADDEN, J., Pro Tem. concurs, and SHEPARD, J., concurs except as to Part I, in which he concurs in the result.

BAKES, Justice, concurring in part and concurring in the result in part:

I concur in all of the majority opinion except Part I in which I concur only in the result. The results reached in Part I of the majority opinion necessarily follows from our decisions in *McClure v. Nampa Highway Dist.*, 102 Idaho 197, 628 P.2d 228 (1981), and *Gavica v. Hanson,* 101 Idaho 58, 608 P.2d 861 (1980), in which the Court held that the failure to post a warning sign did not fall within the discretionary function exception set out in I.C. § 6–904(1).

BISTLINE, Justice, dissenting in parts II, III, and VII.

I have no trouble with the statement of the underlying facts and I have readily concurred in parts I, IV, V, and VI of the opinion of the Court. I am unable to concur in parts II, III, and VII, and will address each separately.

### Part II. Post-Accident Signing
#### A.

The resolution of this issue of law is important to future personal injury actions, but in my view is far overemphasized by the defendants, and in turn the Court, as applied to this case. Were the Court to merely assume that the evidence of post-accident signing was improperly admitted, it could then in a cleared atmosphere consider whether the error is reversible—a conclusion to which it jumps without discussion. The sign said only this:

"One Lane Bridge for Trucks Buses"[1]

Just how the introduction into evidence of this sign is supposed to have prejudiced the jury escapes me, and yet the State, in pushing its *in limine* motion, saw something in the act of signing which it wanted to keep from the jury. Now, in that regard, the State would just as well have tried to keep from the jury whether it is or is not daylight at high noon. Just as most people in Bonner County, Idaho, know that it is, one may be certain that jurors in Bonner County were well aware of the erection of the particular sign on the particular bridge on a main highway between Sandpoint and Clark Fork, the trial taking place a considerable time after the collision.

Any error in allowing such evidence to go before the jury, and I see none, does not rise to such prejudicial heights as to necessitate a reversal, other substantial evidence clearly entitling the jury to find liability on the part of the State. The Court nevertheless addresses the issue, and champions the archaic and illogical view that that which in actuality is cogent evidence on the issue should be kept from the jury.

Whatever happened to the doctrine of cure by jury verdict in *Archer v. Shields Lumber Co.,* 91 Idaho 861, 434 P.2d 79 (1967), in which this Court reaffirmed?

"This court has frequently held, in effect, that even though certain elements of damages have been erroneously submitted to a jury and erroneous instructions thereon have been given to a jury, such errors will be held non-prejudicial where other evidence is abundant to justify the verdict without taking into consideration the erroneously admitted evidence and the erroneous instructions. (Citations omitted.) . . .

 " ' . . . There is no doubt but that the court should not give an instruction on a question of law that is not involved in the pleadings or proofs, but we are equally satisfied in this case that the appellant has not been prejudiced or injured or damaged on account of the instruction, and we are unwilling to reverse the judgment for that reason.'

---

1. What does it mean? Is it a warning? Is it a command? Is it merely directive? Does it apply to just trucks and buses? How is it to be applied? None of these questions are answered in the briefs of the parties, and probably because no certain answers are to be found. My own research has taken me to the statutes and to the Department of Law Enforcement's driver's manual—all without success. Inquiry made of many and various informed persons throughout the state has returned me for my effort many and various surmises—but no answers.

"*Thus because of the verdict rendered by the jury the errors in instructions and admissibility of evidence claimed by the appellant are deemed non-prejudicial and non-reversible.*" *Id.* at 868–69, 434 P.2d at 86–87 (emphasis added).

Looking toward a distant date, the importance of the question justifies the presentation of what some may find a better view.

### B.

Admittedly the general rule governing evidence of post-accident repairs or alterations, which for ease of reference will be referred to as the "repair rule," is that such evidence is inadmissible. Two theories have been advanced in support of this rule. The first, exclusively relied on in Idaho cases applying the rule, is that evidence of subsequent alterations or repairs is irrelevant to the question of antecedent negligence. *See Alsup v. Saratoga Hotel,* 71 Idaho 229, 229 P.2d 985 (1951); *Giffin v. Lewiston,* 6 Idaho 231, 55 P. 545 (1898). The second theory, which Idaho has never embraced, is that to admit such evidence will discourage subsequent repairs, thereby engendering further danger from a situation which has already produced one accident. *See* McCormick's Handbook of the Law of Evidence, § 275 at 666 (2d ed. 1972); *Hull v. Enger Construction Co.,* 15 Wash.App. 511, 550 P.2d 692, 697 (1976).

The trial court, in denying the State's motion *in limine* and admitting the evidence of post-accident signing of Lightning Creek Bridge, relied upon two cases: *Otts v. Brough,* 90 Idaho 124, 409 P.2d 95 (1965), and *Zenier v. Spokane International Railroad Co.,* 78 Idaho 196, 300 P.2d 494 (1956). These cases, set forth as an exception to the rule, considered the admission of evidence of subsequent repairs for the purpose of showing a defendant's "recognition of a defect which he was duty bound to remedy." *Otts, supra* 90 Idaho at 135, 409 P.2d at 101. The question in *Otts,* however, was who had the duty to correct a particular dangerous condition, *i.e.,* who had control over the area where the accident occurred, a well settled exception to the repair rule—that "evidence of subsequent repairs or changes

[may be] admitted as evidence of the defendant's ownership or control of the premises or his duty to repair where these are disputed...." McCormick's Handbook of the Law of Evidence, *supra,* § 275 at 667 (footnotes omitted). The statement in *Zenier* was merely *dicta,* since the Court there had already held that appellant waived the right to raise the issue on appeal by failing to object below. The trial court in the instant case may have read the language in *Otts* and *Zenier* reflecting this exception too broadly where here there was no dispute as to the fact that the State controlled this bridge. But, that is not to say that the ruling was in error, and certainly not reversible error.

As noted, the sole reason heretofore recognized by this Court for excluding evidence of subsequent repairs is that such evidence is irrelevant to proving antecedent negligence. *Alsup v. Saratoga Hotel, supra, Giffin v. Lewiston, supra.* After careful consideration it can be seen that the reason has no basis in fact or logic. The "irrelevancy" rationale for excluding evidence of post-accident repairs has been almost universally discarded by modern courts. *See* McCormick's Handbook of the Law of Evidence § 275 at 666 (2d ed. 1972). *See generally* Schwartz, *The Exclusionary Rule on Subsequent Repairs—A Rule in Need of Repair,* 7 Forum, 1, 2–3 (1971); Soo Hoo & Soo Hoo, *Evidence of Subsequent Repairs: Yesterday, Today and Tomorrow,* 9 U.Cal.Davis L.Rev. 421, 422 (1976); Note, *The Repair Rule: Maine Rule of Evidence 407(a) and the Admissibility of Subsequent Remedial Measures in Proving Negligence,* 27 Me.L.Rev. 225, 228–32 (1975); Note, *An Exception to the Exceptions: The Subsequent Repair Rule in Montana,* 42 Mont.L. Rev. 143, 145–46 (1981). The repair rule evolved at a time when "*legal* relevance" rather than "*logical* relevance" prevailed in determining whether evidence would be admissible. As one commentator explains:

"Legal relevancy generally required a degree of probative value higher than mere logical relevance. Some judges went so far as to hold that a fact offered

as the basis of an inference could be admitted only when the desired inference was more probable than any other inference. Furthermore, the ability of a fact to support the inference of another fact was determined by reliance on precedent rather than logical analysis. Applied literally, the concept of legal relevancy excluded logically relevant evidence unless legal precedent authorized its admission." Note, supra, 27 Me.L.Rev. at 229 (footnotes omitted).

The instant case demonstrates the fallacy of such a formalistic approach in determining relevance. The fact that the State, through a careful and prolonged study,[2] concluded that bridges such as Lightning Creek Bridge required special signing is unquestionably relevant in determining whether the bridge was dangerous at the time of the accident (less than a year before the signs were actually posted) and in determining the State's duty with respect thereto. Few items of evidence could be more relevant than the State's determination that its own bridge required further signing. "[U]nder the modern and more liberal theory of relevancy, any fact tending to make more probable the existence of a material fact is relevant and potentially admissible into evidence. Therefore, evidence of the defendant's conduct in making subsequent repairs may be relevant as a circumstance tending to show consciousness that the situation called for additional safety precautions." Note, supra, 32 Okla.L. Rev. at 374 (footnotes omitted). This will be true in the majority of cases in which post-accident repairs take place; in those cases in which the subsequent repairs are so remote in time and unrelated to the accident that they are in fact irrelevant to the question of antecedent negligence, courts are free to exclude such evidence on relevancy grounds in any event. See Mann v. Safeway Stores, Inc., 95 Idaho 732, 739, 518 P.2d 1194, 1201 (1974). We have already stated in Mann that "[i]n Idaho, subsequent changes in conditions or repairs are admissible ... if material to the case at hand." Id. See also Golden Gate Hop Ranch, Inc. v. Velsicol Chemical Corp., 66 Wash.2d 469, 403 P.2d 351 (1965), cert. denied, 382 U.S. 1025, 86 S.Ct. 644, 15 L.Ed.2d 539 (1965) (evidence of subsequent conduct inadmissible only when it has no probative value). We could now bring analytical simplicity and uniformity to our approach to this question by stating the rule for what it is: Evidence of subsequent repairs or changes in conditions is admissible to prove antecedent negligence so long as it is material and relevant to the issue of negligence.[3] Alsup v. Saratoga Hotel, supra. Giffin v. Lewiston, supra, and Harvey v. Alturas Gold Mining Co., 3 Idaho 510, 31 P. 819 (1893), should be overruled to the extent that they are inconsistent with the rule stated above.

### C.

The State argues that Idaho should adopt the reasoning applied in other jurisdictions to exclude evidence of subsequent alterations or repairs. These jurisdictions exclude such evidence on public policy grounds; the asserted policy is that if such evidence is admissible, people will be discouraged from undertaking necessary repairs. See Niceville v. Hardy, 160 So.2d 535 (Fla.App.1964) (allowing evidence of alterations would discourage improvements after accident); City of Newport v. Maytum, 342 S.W.2d 703 (Ky.1961) (offers inducement to omit repairs and improvements calculated

2. The directive from the State as to signing bridges 18' to 22' in width which was introduced by plaintiffs was a product of this study. The State had ample opportunity to argue the relevance of this subsequent signing by asserting that the signing of Lightning Creek Bridge was a response to this study and directive, and not a response to the accident. The ultimate relevance of the subsequent signing, after both parties had the opportunity to address it, was correctly left in the hands of the jury.

3. Maine has similarly rejected the repair rule, albeit through its codified rules of evidence. See Me.R.Evid. 407(a) ("When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is admissible.").

to prevent future accidents); *Lea v. Baumann Surgical Supplies, Inc.,* 321 So.2d 844 (La.App.1975), *cert. denied,* 325 So.2d 279 (La.1976) (people should be encouraged to make repairs and improve conditions). *See generally* Annot., *Admissibility of Evidence of Repairs, Change of Conditions, or Precautions Taken After Accident,* 64 A.L.R.2d 1296 (1959) and Later Case Service. I am not, however, persuaded that public policy compels such a rule.

I begin by noting that the evidence excluded by what has come to be known as the "repair rule" is otherwise entirely reliable, trustworthy and relevant. In short, the evidence is a valuable aid to factfinders in discerning the truth of the matter at issue, and it necessarily follows that exclusion of this evidence decreases the probability that a jury will arrive at an accurate assessment of the facts. Since the State is asking us to develop an obstacle to the factfinding process, it bears the burden of demonstrating (1) that a genuine need for the rule exists, and (2) that the rule will meet this need. This it has failed to do.

An exhaustive independent review of cases applying the repair rule fails to reveal any empirical data to support the rule's primary public policy assumption—that if evidence of subsequent repairs is admitted, people will be discouraged from making repairs. The rule was originally devised by courts who—like previous Idaho courts—felt that such evidence was irrelevant to antecedent negligence. The rule apparently originated, or at least was first clearly articulated, in *Hart v. Lancashire & Y. Ry. Co.,* 21 L.T.R. (N.S.) 261 (Ex.1869), in which Baron Bromwell made the oft-quoted statement that the law rejects the idea that "because the world gets wiser as it gets older, therefore it was foolish before." *Id.* at 263. This "relevancy" reason for the rule survived until the turn of the century, when the alternative public policy grounds which the State today urges upon us began to supplant relevancy grounds as a basis for excluding such evidence. *See* Note, *The Repair Rule: Maine Rule of Evidence 407(a) and the Admissibility of Subsequent Remedial Measures in Proving Negligence,* 27 Me.L.Rev. 225, 226–28 (1975):

"Quite frequently, those courts that excluded evidence of subsequent repairs as irrelevant noted parenthetically that even if such evidence were relevant it should be excluded on grounds of policy. These courts stated that the evidence should be excluded for reasons of public safety as the admission of such evidence might discourage defendants from repairing their property thereby continuing the risk of harm. As a result, an alternative basis for exclusion grounded in public policy began to emerge. Without expressly addressing the issue of relevance, this basis gradually supplanted lack of relevance as the rationale for exclusion." *Id.* at 227 (footnotes omitted).

Thus it appears that the public policy reason for the repair rule evolved from judicial hypothesizing as to the effect of the rule's abolition, and not from any empirical data concerning the rule's effect on tortfeasors. *See* Schwartz, *The Exclusionary Rule on Subsequent Repairs—A Rule in Need of Repair,* 7 Forum 1, 6 (1971) ("Throughout the rather long and tortuous history of the rule excluding [evidence of] repairs, no court or writer has produced any empirical data showing that the rule has resulted in a single repair or that its absence would discourage repair activity.").

I am unpersuaded by the naked, unsupported assertion that repairs will not take place if evidence of such repairs is admissible. A number of reasons discount the logic of such an assertion. First, the repair rule has become riddled with so many exceptions that there is practically no basis, even with the existence of the rule, for assuming that evidence of subsequent repairs will not in fact be admitted. For example, such evidence may be introduced to show control over an area, *Otts v. Brough,* 90 Idaho 124, 409 P.2d 95 (1965); to show conditions at the time of the accident, *Polster v. Griff's of America, Inc.,* 184 Colo. 418, 520 P.2d 745 (1974); to show a specific duty attributable to one of the parties, *Baldwin Contracting Co. v. Winston Steel Works, Inc.,* 236 Cal.

App.2d 565, 46 Cal.Rptr. 421 (1965); to rebut or impeach other evidence, *Kenny v. Southeastern Pennsylvania Transportation Authority,* 581 F.2d 351 (3d Cir.1978), *cert. denied,* 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979); and to show the possibility of avoiding the injury (feasibility), *Faeber v. Roelofs,* 298 Minn. 16, 212 N.W.2d 856 (1973). *See generally* Note, *supra,* 42 Mont. L.Rev. 143; Annot., *supra,* 64 A.L.R.2d 1296 and Later Case Service. Additionally, the rule has been held inapplicable in strict liability cases, *see Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1975); *Sutkowski v. Universal Marion Corp.,* 5 Ill.App.3d 313, 281 N.E.2d 749 (1972), and worker's compensation cases—*see Rich v. Tite-Knot Pine Mill,* 245 Or. 185, 421 P.2d 370 (1966).

The second reason weighing against adopting the public policy rationale for the repair rule is that the underlying premise—that repairs will not be made if evidence of those repairs is admissible in a subsequent suit—ignores the fact that liability for dangerous conditions will not only continue, but increase, following an accident.[4] This fact has prompted courts to reject the repair rule in strict liability cases. *See Ault v. International Harvester, Inc., supra; Sutkowski v. Universal Marion Corp., supra; Brown v. Michael Business Machines Corp.,* 104 Misc.2d 200, 428 N.Y.S.2d 148 (Sup.Ct. 1980). No distinction exists, except perhaps in degree, between the liability incentive to correct deficiencies in products liability cases and the liability incentive to make repairs when the action is based on negligence. Given the numerous exceptions to the repair rule, the incentive to undertake repairs provided by the rule is relatively slight in comparison to the incentive provided by the possibility of further liability if no repairs are made. The first simply cannot outweigh the second in the minds of tortfeasors. Thus abolition of the rule would

be unlikely to result in dangerous conditions remaining unrepaired. As one commentator put it:

"Would a lawyer advise Apex in the hypothetical case [when a person has been injured by a defective coffee machine], 'whatever you do, do not repair that coffee machine!?' Clearly few, if any, attorneys would give such advice, and their judgment would not be prompted by purely altruistic motives. For example, Apex's failure to make repairs of a known hazard could be used against it on the negligence issue in a subsequent case. Thus, competent attorneys today advise their clients to make repairs even though, as has been indicated, evidence of such repairs may come before a future jury under one of the exceptions to the exclusionary rule." Schwartz, *supra,* 7 Forum at 6 (footnotes omitted).

Finally, I note that the public policy reason asserted by the State in support of the repair rule assumes that a rather callous economic weighing process occurs in every tortfeasor's mind following an accident, and that such tortfeasors are aware of such things as the repair rule. I doubt that there is such a total absence of compassion and concern among the general public. Even were I to assume that the general public would not repair dangerous conditions out of a fear of liability, certainly such an assumption would not apply to the State, which is politically responsible to its citizens, and which must fulfill the trust obligation which every government has towards those whom it serves. The common sense of the common man or woman, and certainly the dutiful state employee, should dictate that when faced with a dangerous condition which has caused an accident, the better course of action is to repair the condition. For all of these reasons, I would uphold the trial court's ruling which allowed the jury the benefit of evidence, the

4. If a second accident occurred, under substantially similar circumstances, the first accident would ordinarily be admissible as evidence of the knowledge of the person in control of the dangerous condition. *See Toftoy v. Ocean Shores Property, Inc.,* 71 Wash.2d 833, 431 P.2d 212 (1967). Thus, once one accident occurs, the possibility that the tortfeasor will be found liable if a second accident occurs necessarily increases. As the possibility of liability increases, so does the tortfeasor's incentive to correct the condition.

existence of which they could hardly have not known anyway.

### III.

### Perpetual Immunity

Plainly put, I am both bewildered and concerned with the Court's "choice" "to construe our statute as the California statute was construed at the time our legislature acted." That it is purely a matter of "choice," I have no doubt, as I see nothing of any substance in the Court's opinion to support that choice.

The declared hypothesis upon which the Court makes its choice is the unfounded premise that the 1971 Idaho legislature also made the *choice* "to enact a version more like the California statute," which is said to be based upon "the striking similarity of language between the Idaho and California statutes." It is also said that California in 1963 appears to have been the first state to enact a design immunity statute, and as it is also said, *Becker v. Johnston,* 67 Cal.2d 163, 60 Cal.Rptr. 485, 430 P.2d 43 and *Cabell v. State,* 67 Cal.2d 150, 60 Cal.Rptr. 476, 430 P.2d 34, companion 1967 cases, construed that California design immunity statute, from which it is said to follow that Idaho litigants shall be forever bound by those cases, notwithstanding their total rejection by the California court a short five years later—which is fast action in the appellate court business. The sum total of this Court's *choices* and *conclusions* of today is that Idaho litigants are plagued now and henceforth with overruled California case law which is not visited upon Californians, that is, unless they are foolish enough to travel across bridges in Idaho.

The Court, I fear, is on thin ice and acts without concern for its public image. No precedent is cited for the proposition that the courts of any state are to be forever bound by an overruled case from another jurisdiction—wherein it has been thoroughly discredited as well as overruled. I would prefer to see our Court take a more in-depth look into the muddy waters below before tarrying too long on ice so thin as this.

The *Cabell* and *Becker* holdings were suspect even as they were issued, and long before the later case of *Baldwin v. State,* 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121 (1972), interred them (other than in Idaho) forever.

The New York Court of Claims Act clearly came earlier than California's 1963 Tort Claims Act, the New York Act having been passed in 1960. By the year 1963 New York courts had had occasion to make many interpretations and applications of the New York Act, and one of these had to do with design immunity. That case was *Weiss v. Fote,* 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960), decided by that state's highest appellate court, the Court of Appeals of New York. Therein the highest New York court explained its decision in *Eastman v. State of New York,* 303 N.Y. 691, 103 N.E.2d 56 (1951), of which it said that:

"The court's decision simply reflects the rule that, once having planned the intersection, the State was under a continuing duty to review its plan in the light of its actual operation and that the proof established a breach of such duty. More particularly, the court considered, as sufficient to demonstrate a violation of the State's continuing obligation to maintain the safety of the highways, evidence that physical conditions had changed at the intersection and that a number of accidents had occurred after the stop sign had been removed." *Weiss v. Fote,* 7 N.Y.2d at 587, 200 N.Y.S.2d at 414, 167 N.E.2d at 67.

Significantly, and obviously something the Court here must have overlooked in its reach to overruled cases as supporting authority is the opening paragraph in the dissenting opinion of Justice Peters in *Cabell,* and repeated in *Becker:*

"The interpretation of section 830.6 of the Government Code in the majority opinion is demonstrably erroneous. The section is but one of many statutes dealing with governmental immunity drafted by the Law Revision Commission after

several years of study. Section 830.6 was adopted by the Legislature exactly as recommended by the commission. The latter expressed its interpretation of its proposed language as follows:

" '*The immunity provided by section 830.6 is similar to an immunity that has been granted by judicial decision to public entities in New York. See Weiss v. Fote,* 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960).'

"Thus, in no uncertain terms we are told that the intent of the section was to adopt the rule of *Weiss v. Fote,* supra. That case makes it crystal clear that the immunity granted for plan and design was not intended to apply to negligent maintenance after the agency has notice that the improvement has created a dangerous situation. That is the instant case.

. . . .

"*Weiss v. Fote,* supra, makes it clear that the immunity there adopted, and adopted here by reference, has no application where the plaintiff is seeking to recover because after the approval of the plans accidents occurred which demonstrated a dangerous condition. The basis for the immunity is that, where a duly authorized agency of government in the exercise of its expert judgment has approved the plan or design for a public improvement, its judgment is to be preferred over that of a jury, and something more than a mere choice between conflicting expert opinions is required before the governmental entity may be charged with a failure to discharge its duties to protect the public.... Where the charge of failure to perform the duty to maintain is based on the actual operation of the improvement as shown by accidents occurring subsequent to the approval of the plan or design, the jury is not merely reweighing the matters considered by the governmental agency when it approved the plan or design, and, in the absence of a showing that the governmental agency reconsidered its plan or design in the light of the subsequent evidence that the plan or design

gave rise to a dangerous condition, section 830.6 of the Government Code does not preclude recovery at least where the governmental agency has failed to remedy a dangerous condition after it has learned of the danger and had ample time to correct it." *Cabell v. State,* 60 Cal. Rptr. at 481, 430 P.2d at 37–38 (Dissenting opinion of Justice Peters) (emphasis added).

Justice Peters, in a footnote, and generally citing the same rules of statutory construction, mentioned in Justice Donaldson's opinion of the Court, points out clearly the irresponsible violation of those rules by the majority in *Cabell:*

"It is a well settled principle of statutory construction that, where legislation is framed in the language of an earlier enactment which has been judicially construed, there is a very strong presumption that there was an intent to adopt the construction as well as the language of the prior enactment. This principle has been held to apply when the statute copied by California is that of another state, is federal legislation, or is that of a foreign government.... This rule by compelling analogy, is clearly applicable where the Legislature, as here, has indicated its intent to adopt a rule established by a judicial decision of another state. In such a case, absent an indication to the contrary, there is a strong presumption that the Legislature intended to follow the rule as set forth in the decision. There is certainly no indication here that the Legislature in adopting section 830.6 based on *Weiss v. Fote,* supra, intended to greatly expand the immunity established by that case. The majority have directly violated the limitations expressed in that case, and in so doing have violated this fundamental rule of construction." 60 Cal.Rptr. at 480 n. 2, 430 P.2d at 38, n. 2.

Instead, and notwithstanding, the clear caution of Justice Peters that the *Cabell* majority was engaged in gross appellate malpractice, this Court today follows the suit of the *Cabell* majority, relying on *Cabell* as the

*sole* support for its conclusion that the legislature intended to create perpetual immunity, even though at the same time callously admitting that those cases were overruled in *Baldwin v. State,* 6 Cal.3d 424, 99 Cal. Rptr. 145, 491 P.2d 1121 (Cal.1982). I pause to mention that the *Baldwin* case, was a unanimous opinion of the California Supreme Court, whereas the earlier companion cases of *Cabell* and *Becker* were not unanimous, Justice Peters being joined by Tobriner in his dissenting, the reading of which in our first opinions I commended to the other members of the Court. In addition, two members of the California Supreme Court, Justice Sullivan and Justice Mosk, for some reason did not sit with the court on the earlier cases, but were sitting on the *Baldwin* case. As pointed out in *Baldwin,* the *Cabell* and *Becker* opinions did not actually display any great amount of judicial wisdom, but were largely hinged on a law review article which apparently caught the fancy of the *Becker* court.

The issue presented is whether the court erred in admitting evidence of bridge construction standards promulgated after Lightning Creek Bridge was constructed. It is uncontested that Lightning Creek Bridge was constructed in conformance with the standards applicable in 1937. The trial court granted a motion *in limine* by the State excluding "the plan or design for construction of the bridge" as an issue in the case. This ruling was based on I.C. § 6–904(8), which provided at all relevant time that:

"A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

. . . .

"8. Arises out of a plan or design for construction or improvement to the high-

ways, roads, streets, bridges, or other public property where such plan or design is prepared in conformity with standards in effect at the time of construction, previously approved in advance of the construction or approved by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval." [5]

During the trial, the plaintiffs were allowed to introduce evidence that the bridge did not conform to *subsequently* promulgated design standards. Plaintiffs' expert witness, Gerald Cysewski, testified that the bridge was substandard when compared to these later promulgated design standards and that it deviated from those standards in that it was narrower than the width that those standards dictated. After the parties presented their cases, the court instructed the jury that:

"[T]he immunity from liability on the part of a public entity, which was heretofore read to you, is not necessarily permanent or perpetual. The immunity granted by that law may disappear if and when conditions have changed. *Where a plan or design, properly approved and prepared in conformity with standards in effect at the time of construction, in its actual operation under changed physical conditions produces a dangerous condition of which the public entity has notice, and proximately causes injury, the public entity does not retain such immunity.*

*"Once the public entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act with ordinary care to protect against the danger.* Such notice may be actual or constructive, and must be a sufficient time prior to the injury to have permitted

5. Subsection 8 of I.C. § 6–904 was amended in 1978, after the trial and judgment in this case. It now provides:

"8. Arises out of a plan or design for construction or improvement to the highways, roads, streets, bridges, or other public property where such plan or design is prepared in substantial conformance with engineer-

ing or design standards in effect at the time of preparation of the plan or design, approved in advance of the construction or approved by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval."

the public entity to take measures to protect against the danger." (Emphasis added.)

The State argues that the admission of evidence of post-construction standards, and the giving of the above quoted instruction, are contrary to I.C. § 6–904(8) and constitute reversible error. Even without California's *Baldwin* and New York's *Weiss v. Fote,* I would disagree—and with those cases, I strongly disagree. The instruction given by the trial court, the Honorable Dar Cogswell, is beyond question a correct statement of the law. Judge Cogswell's judicial ability is well-recognized, and without question his statement of the law is in accord with the views of the *Baldwin* court—some of those justices candidly recanting their participation in *Cabell* and *Becker*—never an easy thing to do.

I.C. § 6–904(8) was intended to immunize the State from suits challenging the sufficiency of *plans* or *designs* for certain public projects (including bridges) so long as those plans and designs are in substantial conformance with standards applicable at the time of construction. The policy behind the statute is clearly to prevent juries from second-guessing the judgment of state planners and engineers who make detailed and careful studies prior to the construction of public roads and bridges. *See, e.g., Weiss v. Fote,* 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960). The statute does not by its terms absolve nor even purport to absolve the State from liability for failing to react to dangerous conditions caused by changed circumstances of which it has become aware with time in which to have taken appropriate action.

Plaintiffs were allowed, over the State's objection, to put on evidence of subsequently promulgated bridge design standards and other evidence that Lightning Creek Bridge did not meet these standards. However, this evidence was used solely for the purpose of proving that the State knew, or should have known, that Lightning Creek Bridge was potentially hazardous in light of changing traffic conditions. The evidence of the changed standards was presented in conjunction with other evidence indicating that there had been a substantial increase in the amount, speed and type of traffic using the bridge since it was first constructed; that there had been several other accidents and frequent collision damage to this particular bridge; that the State was aware of these accidents and the frequency of collisions with the bridge; and that the bridge had been placed on priority "A" for replacement due in part to "vertical clearance restriction and width." In short, plaintiffs' theory below was that the change in traffic conditions on Lightning Creek Bridge since 1937 made what may once have been a safe bridge unsafe, and that the State was put on notice of the hazardous nature of the bridge by (1) its knowledge of changing standards for such bridges, (2) its knowledge of changes in traffic flow conditions, and (3) its knowledge of accidents and frequent collisions with the bridge at Lightning Creek Bridge itself. The instruction given by the trial court to the jury on this issue correctly reflects the plaintiffs' theory of the case.

The proper framing of the question presented by the State, then, is whether I.C. § 6–904(8) was intended by the legislature to *perpetually* immunize the State from liability arising out of plans or designs for, among other things, bridges, despite changes in conditions that create a hazard which was unforeseen at the time of construction but of which the State becomes currently aware. As I have noted, the statute does not provide such immunity on its face, and not one scintilla of evidence is before the Court to show that the legislature intended such a result.

There is a dearth of legislative history in Idaho on most statutes, including the statute currently at issue. Legislative intent can occasionally be gleaned from examining the evolution of a statute through a number of amendments; such is not the case here. There is no indication that the Idaho Tort Claims Act in general, or this subsection of the act in particular was drawn from the act of another state. However, a fact is that Idaho attorneys were familiar with the

Tort Claims Act and Idaho attorneys were in the legislature, but even so, we have no history of what effect this may have had on the Idaho Act. Therefore, an examination of the purposes of the act and its structure as a whole is necessary to discern what the legislature intended the scope of I.C. § 6–904(8) to be. *See Janss Corp. v. Board of Equalization,* 93 Idaho 928, 478 P.2d 878 (1970); *Jackson v. Jackson,* 87 Idaho 330, 393 P.2d 28 (1964).

I.C. § 6–903(a) provides in part that "[e]xcept as otherwise provided in this act, every governmental entity is subject to liability for ... damages arising out of its negligent or otherwise wrongful acts or omissions...." It is clear from this section that the Act intended to make liability on the part of the State the general rule, and to cloak the State with immunity only under a limited set of circumstances. Since the express purpose of the act is to establish liability, the exceptions to that liability, such as I.C. § 6–904(8), should be interpreted narrowly. It would be contrary to the fundamental purpose of the Tort Claims Act to hold that the design immunity afforded by I.C. § 6–904(8) was also intended to remove any duty on the part of the State to react to known dangerous conditions which develop after a project has been constructed, when such an exception does not appear in the plain language of the statute.

I.C. § 6–903 also provides that "every governmental entity is subject to liability ... where the governmental entity if a private person or entity would be liable...." Thus, in determining whether the legislature intended the State to be liable for failing to respond to changing conditions after initially designing and constructing a presumptively safe bridge, some measure of insight can be gleaned from analogous situations in the private sector.

It is evident that if a private party had constructed a safe bridge, which subsequently became hazardous due to changed conditions, and the party was aware of its hazardous condition, but did nothing to correct it, that party could be liable to third parties injured by the hazardous condition. The landowner would not be immunized simply because at an earlier time the bridge was safe, and therefore the landowner would not have been subject to liability.

The Restatement of the Law, Second, Torts § 314(A) (1965), states: "Special Relations Giving Rise to Duty to Aid or Protect ... (3) A possessor of land who holds it open to the public is under a [duty to protect against unreasonable risk of harm] to members of the public who enter in response to his invitation." Comment *d* to this section explains:

"The duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct, or the condition of his land or chattels. It extends also to risks *arising from forces of nature* or *animals,* or *from the acts of third persons,* whether they be innocent, negligent, intentional, or even criminal.... It extends also to risks arising from ... the negligence of the plaintiff himself, as where a passenger is about to fall off a train, or has fallen." (Emphasis added.)

This section does no more than succinctly state the law as it has always been in Idaho. As this Court held in *Mann v. Safeway Stores, Inc.,* 95 Idaho 732, 738, 518 P.2d 1194, 1200 (1974), in regard to invitees,[6] "[an owner of land upon which the public is invited has] the duty to maintain the premises in a reasonably safe condition and to warn of any hidden or concealed danger of which it knew or should have known by the exercise of reasonable care." This duty exists regardless of how the dangerous condition arises so long as the owner or possessor of the property is aware of the condition. *See Tommerup v. Albertson's, Inc.,* 101 Idaho 1, 607 P.2d 1055 (1980) (owner must have

6. I do not address, nor were we asked to address, whether users of public highways are more analogous to licensees or invitees. Suffice it to say that both are owed a duty, and the State through I.C. § 6–903 has also assumed a

duty. We noted in *Gavica v. Hanson,* 101 Idaho 58, 65, 608 P.2d 861, 868 (1980), that the State has a duty to maintain highways "upon which the public is *invited* to travel." (Emphasis added.)

actual or constructive notice before liability from acts of third persons creating dangerous condition attaches). *See also Mann v. State,* 70 Cal.App.3d 773, 139 Cal.Rptr. 82 (1977) (jury question as to whether officer who *knew of* position of stranded motorists had duty to protect them from traffic dangers by remaining at the scene); *DiSalvo v. Armae, Inc.,* 41 N.Y.2d 80, 390 N.Y.S.2d 882, 359 N.E.2d 391 (1976) (jury question as to whether resort owner had duty to guests to supervise children when owner knew that adult and child activities were separated by road upon which child was struck). In short, since "a private person or entity" would have a duty to make safe for invitees any known dangerous condition on the person or entity's property and would be liable for a breach of that duty, even where the property was not originally dangerous, but was subsequently made dangerous by circumstances outside the control of the property owner, I.C. § 6–903 necessarily envisions that the State be liable under the same circumstances. I.C. § 9–604(8)'s design immunity does not specifically address changed conditions and, since I.C. § 6–903 otherwise makes the State liable for such conditions, in my opinion we should avoid the conflict between the two statutory provisions which results by reading immunity for such circumstances into I.C. § 6–904(8).

Finally, I note that policy considerations dictate such a result. As one commentator put it:

"[T]he immunity granted in § 830.6 [California's design immunity statute] should only extend to cases where the entity has not received notice of the dangerous condition. After notice has been received, the entity should be held liable for the dangerous condition if the measures taken to protect against it were not 'reasonable' as defined in § 835.4. This construction would adequately protect policy decisions as to the adoption of plans for public construction and would not unduly shield the entity from 'reasonably' maintaining a dangerous condition by defeating valid claims of an injured party.

"Not only would this construction seem to balance more equitably the need for protecting the entity from suit on discretionary decisions against the need to allow private compensation where it is justified and valid, but it also carries out the clear legislative intent behind the Act and does not produce inconsistencies among the provisions of the Act nor restrict them to the point of being almost meaningless. Nor does it force the injured party to try to find liability under provisions outside of the chapter intended to impose liability for the dangerous condition of public property." Comment, *An Unusual Defense Available to Public Entities in the Area of the Maintenance of Dangerous Conditions on Public Property,* 4 U.S.F.L.Rev. 442, 450–51 (1970) (footnotes omitted).

As stated in *Baldwin v. State,* 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121 (1972):

"Having approved the plan or design, the governmental entity may not, ostrich like, hide its head in the blueprints, blithely ignoring the actual operation of the plan. Once the entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard." *Id.,* 99 Cal.Rptr. at 151, 491 P.2d at 1127 (footnote omitted).

I agree. I.C. § 6–904(8) was not intended, and should not be read, to provide immunity for anything other than the designs or standards in effect at the time a bridge was constructed and, if thereafter, only for so long as the public entity was not put on notice of changed conditions which produced the potential of injury and damages.

### PART VII

At the outset, I apprehend that the trial bench and bar will wonder why the Court addresses the issue of the constitutionality of I.C. § 6–926, having vitiated the verdict of the jury by its disposition of the issues presented in parts II and III. "It is a well established principle ... that this Court 'will not pass upon questions of constitutionality until [they are] presented in a cause demanding rulings thereon.'" *State*

*v. Hightower,* 101 Idaho 749, 757, 620 P.2d 783, 791 (1980) (quoting *Twin Falls Canal Co. v. Huff,* 58 Idaho 587, 599, 76 P.2d 923, 923 (1938). *Accord, Swensen v. Buildings, Inc.,* 93 Idaho 466, 463 P.2d 932 (1970); *Hill v. Schultz,* 71 Idaho 145, 227 P.2d 586 (1951). The Court's opinion may seem to some, as it does to me, a self-contradiction. The State no longer having any judgment of liability against it, it would seem that other than for some burning desire to reach out now with the Court membership constituted as it is, the Court would properly leave the Constitutional question for another day, when some plaintiff recovers a judgment against the State in excess of $100,000—and the Court is unable to find any substance in the State's allegations of error on issues of liability. But the Court insists, and so I again present what some may find to be a better view and not at odds with our well-received opinion in *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976).

Leliefeld argues that the trial court erred in reducing the amount of damages for which the State was liable to him from $360,010.96 to $100,000. He contends that the statute under which the court acted, I.C. § 6–926, violates the equal protection clause of the fourteenth amendment to the United States Constitution and article I, section 2 of the Idaho Constitution by discriminating against a class of severely injured tort victims. We also have the benefit of an *amicus curiae* brief submitted by the Idaho Trial Lawyers Association discussing the constitutionality of I.C. § 6–926.

I.C. § 6–926 provides in part:

"6.926. Judgment or claim in excess of comprehensive liability plan—Reduction by court—Limits of liability.

. . . .

"(b) Bodily or personal injury or death. —The combined, aggregate liability of a governmental entity and its employees for damages, costs and attorney fees under this act, on account of bodily or personal injury or death of any person, shall not exceed and is limited to one hundred thousand dollars ($100,000) subject to the further limitation of three hundred thousand dollars ($300,000) in any one (1) accident or occurrence arising out of any occurrence wherein two (2) or more persons sustain such injury and/or death, unless the governmental entity has purchased applicable, valid, collectible liability insurance coverage in excess of said limits in which event the controlling limit shall be the then remaining available proceeds of such insurance. If any judgment or judgments, including costs and attorney fees that may be awarded, are returned or entered, and in the aggregate total more than the applicable limit, whether in one (1) or more cases, the court shall reduce the amount of the award or awards, verdict or verdicts, or judgment or judgments in any case or cases within its jurisdiction as to reduce said aggregate loss to said applicable statutory limit or the limits provided by said valid, collectible insurance, if any, whichever was [is] greater.

. . . .

"The court shall reduce any judgment in excess of the limits provided by this act in any matter within its jurisdiction, whether by reason of the adjudication in said proceedings alone or of the total or aggregate of all such awards, judgments, settlements, voluntary payments or other such loss relevant to the limits above provided."

### A.

The first question to be considered is the standard of review to be applied. Three standards of review are available. They are, in order of depth of analysis involved, (1) strict scrutiny, (2) means-focus, and (3) rational basis. Leliefeld urges that the standard applied in *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), is applicable to the limitation in this case. *Jones* employed what has come to be known as the "means-focus" standard for reviewing constitutionality. In applying this middle-tier standard, this Court searches for a "fair and substantial

relationship" between the ends which the legislation seeks to achieve and the means specified in the legislation for achieving those ends. *See Jones, supra* at 870–71, 555 P.2d at 410–11; *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971); *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). Application of the standard is triggered whenever "the discriminatory character of a challenged statutory classification is apparent on its face and where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute." *Jones, supra* 97 Idaho at 871, 555 P.2d at 411.[7] In *Jones,* we held that a statutory scheme to limit liability for medical malpractice triggered the "means-focus" standard of review, and on the record there presented, failed to meet the fair and substantial relationship test for such legislation.

The State argues that the traditional "rational basis" standard of review should be applied in determining the constitutionality of I.C. § 6–926. This is the standard which this Court applied in upholding the 120-day notice requirement of the Tort Claims Act, I.C. § 6–905, against an attack based on the equal protection clause in *Newlan v. State,* 96 Idaho 711, 535 P.2d 1348 (1975), upon which the State relies in this case. Under this standard, this Court looks only to whether the classification is "wholly irrelevant to the achievement of the State's objective." *Newlan, supra* at 714, 535 P.2d at 1351 (quoting *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961)). In *Newlan,* this Court found no "suspect" classification or denial of a fundamental right such as would trigger strict scrutiny (the third, and most demanding standard of review). *See Newlan, supra* 96 Idaho at 713–14, 535 P.2d at 1350–51. Without discussing the middle-level standard of review set forth in *Reed v. Reed* and later applied in *Jones v. State Board of Medicine,* the *Newlan* Court found several valid reasons for requiring that 120 days' notice be given to a governmental entity prior to filing a suit against that entity, and therefore upheld the requirement. The Court quoted with approval a Washington Supreme Court decision upholding the constitutionality of that state's notice requirement and observing:

" 'The state and its political subdivisions with the multitude of departments, agencies, officers and employees and their diverse and widespread activities, touching virtually every aspect of life within the state, render the state and its subdivi-

---

**7.** To this point in time the United States Supreme Court has applied this middle level standard of review only to cases involving classifications based on gender and illegitimacy. *See, e.g., Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (gender); *Reed v. Reed, supra* (gender); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (illegitimacy). The high Court has not yet addressed classifications based on distinctions between degrees of injury. Of course, this Court already has held in *Jones* that classification schemes such as the one presented in this case trigger the "fair and substantial relationship" test under both the United States and Idaho constitutions and, therefore, regardless of whether the United States Supreme Court ultimately agrees with this Court's point of view on the federal constitutional question, in my opinion this Court is required to apply this middle level standard of review under article I, section 2 of the Idaho Constitution. Nothing precludes our constitution from going further than the United States Constitution in protecting the rights of individuals. Furthermore, I agree with the court in *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 830 (1980), that:

"[a]lthough the right to recover for personal injuries is not a 'fundamental right,' . . . it is nevertheless an important substantive right. . . . We [therefore] conclude . . . that the rights involved herein are sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test." (Citations omitted.) *See also Arneson v. Olson,* 270 N.W.2d 125, 133, 135–36 (N.D.1978) (means-focus test); *Simon v. St. Elizabeth Medical Center,* 355 N.E.2d 903, 911 (Ohio Ct.C.P.1976); *Graley v. Satayatham,* 343 N.E.2d 832, 837–38 (Ohio Ct. C.P.1976) (both Ohio cases applying a strict scrutiny test). Taken together with the facially discriminatory nature of the statute challenged in this case, the importance of the right to recover for severe personal injuries suffered *at the hands of the State* places beyond peradventure the need for a more detailed analysis than that involved in applying a rational basis standard.

sions inherently different from any ordinary private tort-feasor. Public funds as opposed to private funds are involved. The number of claims against governmental agencies are vastly greater than against any individual private tort-feasor. An ordinary private tortfeasor is normally immediately aware of an incident involving potential liability, whereas the claim filing statute is usually the only sure and certain means by which the state or its subdivisions may be alerted to potential liability arising from a governmental activity.' *Cook v. State* [83 Wash.2d 599], 521 P.2d [725,] 728 [ (1974) ]." *Newlan v. State,* 96 Idaho at 714–15, 535 P.2d at 1351–52.

This language from *Cook* is *dicta* as to the constitutionality of the notice provisions of the Washington Tort Claims Act. Although the timely notice provisions of the Act were not met by the claimant in *Cook,* the court ruled in favor of the claimant because she came within one of the exceptions to the timely notice requirement. Approximately one year later, in *Hunter v. North Mason High School,* 85 Wash.2d 810, 539 P.2d 845 (1975), the Washington court squarely faced the issue of the constitutionality of the timely notice provision and found it to be unconstitutional, even under a "rational basis" approach to determining constitutionality. The court specifically rejected the *dicta* as to constitutionality in *Cook,* which *dicta* was cited by this Court in *Newlan* and is relied upon by the State in this appeal. *Id.* 539 P.2d at 850–51. It is this same invalidated reasoning which the State urges should be applicable to the limitations on recovery contained in I.C. § 6–926, and upon which the State bases its contention that its unique character as a tortfeasor mandates application of the lesser (rational basis) standard of review. I disagree. The State's position is illogical, and I hesitate to apply a *Newlan* holding which is predicated on *dicta,* and overruled

*dicta* at that. In that regard the validity of the *Newlan* holding is much akin to the validity of part III of the Court's opinion.

Other than that the party benefited by the limitation on liability involved in this case is the State rather than a group of medical doctors, it is impossible to substantively differentiate between I.C. § 6–926 and the statute struck down in *Jones, supra.* At the time our opinion issued in *Jones,* I believed that the Court which overthrew a legislative set ceiling of recovery in medical malpractice cases would be the Court that would apply those same principles when the same issue arose again under the Tort Claims Act. I was, perhaps, a bit naive, or perhaps do not fully understand our *Jones* opinion, but I find it difficult to distinguish the two sets of circumstances.

I.C. § 6–926 meets both of the requirements set forth by *Jones* for triggering the means-focus standard of review; the discriminatory nature of the legislation is apparent on the face of I.C. § 6–926[8] and there is a patent indication of a lack of relationship between the legislation and the purposes of the statute.[9] While the fact that the State is the party benefited may be relevant in *applying* the means-focus standard of review, *see* § B *infra,* it does not follow that this in and of itself excludes application of that standard. As to the rational basis standard applied in *Newlan,* two related points should be made. First, the means-focus standard of review was not addressed in that case. The Court simply selected between the "strict scrutiny" standard triggered by suspect classifications and fundamental rights, and the residual "rational basis" standard. Second, there was no discrimination between classes of tort *victims* in *Newlan.* While the State was distinguished from other tortfeasors in that notice of a claim was recognized as a precondition to its liability, *all* tort victims were treated similarly in *Newlan,* each be-

8. The discrimination in this case is the same as in *Jones, i.e.,* creation of a benefited class (less severely injured tort victims *and,* in this case, the State) at the expense of a burdened class (more severely injured tort victims).

9. Again, as in *Jones,* there is nothing whatever—not an iota of an inkling—in the statute which indicates any factual basis for the $100,-000 limitation.

ing required to submit a claim prior to bringing suit. Thus, the discriminatory nature of the notice requirement was not facially apparent. *See Newlan, supra* 96 Idaho at 714–15, 535 P.2d at 1351–52; *Cook v. State,* 83 Wash.2d 599, 521 P.2d 725, 728 (1974). *But see* dissent of McQuade, J., in *Newlan, supra* 96 Idaho at 719, 535 P.2d at 1354; dissent of Bistline, J., in *Twin Falls Clinic v. Hamill,* 103 Idaho 19, 26, 644 P.2d 341, 348 (1982); *Hunter v. North Mason High School, supra.*

Having determined that our decision in *Jones v. State Board of Medicine,* 96 Idaho 859, 555 P.2d 399 (1976), the fourteenth amendment of the United States Constitution and article I, section 2 of the Idaho Constitution require application of the means-focus standard of review to I.C. § 6–926, I turn to an examination of the statute itself.

### B.

It is clear that the primary purpose of the Tort Claims Act was to allow tort victims injured at the hands of the State to recover for their injuries. Limitations were placed on the State's waiver of sovereign immunity statute for various reasons. For example, as has been stated, the 120-day notice provision of I.C. § 6–905 was intended to facilitate the assessment of damages, settling of claims, and preparation of defenses by the State. *See Farber v. State,* 102 Idaho 398, 401, 630 P.2d 685, 688 (1981); *Newlan v. State, supra.* The design immunity provided by I.C. § 6–904(8) was included to prevent juries from second-guessing the engineering judgment of those who promulgate standards for the construction or improvement of highways, bridges, and other public property. *See* section on Perpetual Immunity, *supra.* The Act contains numerous other exceptions to liability, most if not all of which are grounded upon some attribute unique to the sovereign character of the State. The only purpose of the limitation on liability contained in I.C. § 6–926 and under consideration in this case is obvious and recognized by the parties—to protect the public coffers by setting a maxi-

mum amount for which the State may be liable and thereby (presumably) reducing insurance premiums. The State argues (1) that this is a legitimate public purpose, and (2) that, even under the means-focus standard of review, the $100,000 limitation is fairly and substantially related to the economic goal of the statute. While I agree with the first assertion, I cannot agree with the second.

Leliefeld concedes that protecting the public coffers is a legitimate end to be sought by legislation, and, as I have indicated, I agree. No other purpose is advanced by the State in defense of this statute and it therefore must be assumed that this is in fact the single, and legitimate, goal of I.C. § 6–926. Focusing on the means which the legislature has chosen to effect its purpose, requires a search for a "fair and substantial relationship" between the means and the end. *See Jones,* 97 Idaho at 870–71, 555 P.2d at 410–11; *Reed v. Reed, supra* 404 U.S. at 76, 92 S.Ct. at 254.

In *Jones,* we held that:
"[I]t is apparent from the face of the [Hospital-Medical Liability] Act that a discriminatory classification is created based on the degree of injury and damage suffered as a result of medical malpractice. Rather obviously although the Act is said to be designed to insure continued health care to the citizens of Idaho it cannot do other than confer an advantage on doctors and hospitals at the expense of the more seriously injured and damaged persons. *In the absence of any record we are without information as to the factual basis underlying the purported correlation between limitation of claimant recovery and the promotion of health care for the people of Idaho.*

. . . .

". . . [T]here is no evidentiary basis presented here to either support or refute the relationship between the limitations created by the Act and the abatement of the alleged [medical malpractice insurance] crisis." *Jones, supra* 97 Idaho at 871–72, 555 P.2d at 411–12. (Emphasis added.)

I have already noted that the limitation contained in I.C. § 6–926, like the limitation struck down in *Jones*, facially discriminates against severely injured tort victims. The nature of this type of discrimination is detailed in *American Bank & Trust Co. v. Community Hospital of Los Gatos-Saratoga, Inc.*, 163 Cal.Rptr. 513 (Cal.App.1980), by the following summary:

"Although the Legislature may, in the area of economics and social welfare, create reasonable classifications ... and may even abrogate traditional, common law causes of action, ... 'a law which confers particular privileges or imposes peculiar disabilities upon an arbitrarily selected class of persons who stand in precisely the same relation to the subject matter of the law as does the larger group from which they are segregated constitutes a special law which is tantamount to a denial of equal protection.' (*California Federation of Teachers v. Oxnard Elementary Sch.* (1969) 272 Cal. App.2d 514, 527–528, 77 Cal.Rptr. 497, 509.)

. . . .

"Under-inclusive occurs when a state benefits or burdens persons in a manner that furthers a legitimate public purpose but does not confer the same benefit or place the same burden on others who are similarly situated.

"In the case of the statute which we are here considering [Medical Injury Compensation Reform Act of 1975-(MICRA)], it defies reason why, although the general population purportedly derives the benefits of eliminating the potential windfall from lump-sum judgments, only the victims of medical malpractice must be penalized. Moreover, even if we assume that it is reasonable to burden the medical malpractice victim so that medical malpractice insurance premiums may be lowered, it is incomprehensible why only those victims whose future damages exceed $50,000.00 are singled out. We can only conclude that the Legislature has taxed an impermissible special class for the purported benefits to be enjoyed by the general public." 163 Cal.Rptr. at 520–21.

*See* dissent of Bistline, J., in *Twin Falls Clinic v. Hamill*, 103 Idaho 19, 26, 644 P.2d 341, 348 (1982).

As in *Jones* and *American Bank & Trust*, the legislature here has created an under-inclusive class. The benefit of fully recovering for injuries suffered at the hands of the State accrues only to less severely injured tort victims, while the burden of supporting whatever fiscal benefits the State receives via lower insurance premiums is borne by the more severely injured tort victims. Given the facially discriminatory nature of I.C. § 6–926, the burden falls to the State to provide *some* evidentiary basis to demonstrate that there is a "fair and substantial relationship" between its goal of protecting the public coffers and the creation of this particular limitation on liability. *See Jones*, 97 Idaho at 872, 555 P.2d at 412. *See also Reed v. Reed*, 404 U.S. at 76, 92 S.Ct. at 254; *Kerr v. Department of Employment*, 97 Idaho 385, 545 P.2d 473 (1976). This the State has not done; the record is devoid of any evidence that the limitations on liability set by I.C. § 6–926 are substantially related to preserving the fiscal integrity of the governmental entities covered by the Tort Claims Act.

In *Jones*, we found that an affidavit from the Director of the State Department of Insurance was insufficient to establish that there was a medical malpractice insurance "crisis." In this case, there is nothing more than a bare assertion by the State that the limitations contained in I.C. § 6–926 are substantially related to preserving fiscal integrity. A report by the Legislative Council is attached as an affidavit to the State's brief, apparently in an attempt to provide some evidentiary basis for the State's position. The report, however, states only that "Liability on the part of a governmental entity shall be limited to $100,000 per person, $300,000 per incident, and $100,000 property damage per incident. The committee felt that these limits were realistic for the purposes of insurance while at the same time did not too severely limit a right to recover." This is not evidence of a fiscal

need for the limitation—it is even more conclusory than the State's allegations.

The $100,000 limitation was enacted in 1971 and has not been changed since that time.[10] The value to tort victims of that $100,000 has decreased substantially since that time, while the real-dollars cost to the State of insurance premiums has steadily declined.[11] Thus, the relationship between the State's fiscal purposes and the $100,000 limitation as a means for achieving those purposes becomes increasingly tenuous with each passing year. On the state of this record, it cannot be said that there is a fair and substantial relationship between the dual objectives of (1) allowing recovery by tort victims, and (2) protecting the fiscal integrity of governmental entities, and the means chosen by the legislature in I.C. § 6–926.

I am not unaware that four other states have upheld similar limitations in their tort claims acts. *See Seifert v. Standard Paving Co.,* 64 Ill.2d 109, 355 N.E.2d 537 (1976) (upholding $100,000 limitation on recovery against the state); *State v. Silva,* 86 Nev. 911, 478 P.2d 591 (1970) (upholding $25,000 limitation on tort recoveries against the state); *Estate of Cargill v. City of Rochester,* 119 N.H. 661, 406 A.2d 704 (1979), *appeal dismissed,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980) (upholding $50,000 limitation on tort recoveries against municipalities); *Stanhope v. Brown County,* 90 Wis.2d 823, 280 N.W.2d 711 (1979) (upholding $25,000 limitation on recovery against towns and counties). One state has upheld the constitutionality of a legislative reinstatement of sovereign immunity following judicial abolition of the doctrine. *See*

*Brown v. Wichita State University,* 219 Kan. 2, 547 P.2d 1015 (1976). However, none of the cases upholding specific limitations applied the means-focus test which we adopted in *Jones;* all relied upon a rational basis approach. Furthermore, the New Hampshire court has subsequently reconsidered the propriety of applying the rational basis approach to this type of limitation. That court candidly stated in *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 830–31 (1980), in striking down New Hampshire's medical malpractice limitation act, that:

"In *Estate of Cargill v. City of Rochester, supra* 119 N.H. at 667, 406 A.2d at 707 [(1979)], we applied the rational basis test in evaluating classifications which, like those in RSA ch. 507–C (Supp.1979), place restrictions on an individual's right to recover in tort. We now conclude, however, that the rights involved herein are sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test. *See Hunter v. North Mason School Dist., supra* 85 Wash.2d at 814, 539 P.2d at 848 [(1975)]. Consequently, the classifications created by RSA (Supp. 1979) 'must be reasonable, not arbitrary, *and* must rest upon some ground of difference having a fair and substantial relation to the object of the legislation' in order to satisfy State equal protection guarantees. (Emphasis added.)"

Cases relying on the minimal rational basis standard of review are of little guidance in applying the standard with which we are today concerned.[12] Similarly, the case up-

10. The members of this Court in 1971 were paid $17,500, but today are paid over two and two-thirds times as much as $47,300. On that comparative basis alone, today's State tort victims should be allowed a recovery extending to $266,000.

11. If the State were self-insured, the real-dollars cost to the State of claims paid would also steadily decline with the passage of time due to inflation.

12. The State's reliance on *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1979), is

misplaced. That case dealt with the constitutionality of the Price-Anderson Act, 42 U.S.C. § 2210 *et seq.,* which limits the liability of nuclear power plant owners in the private sector to that amount which can be covered by insurance purchased in the private sector ($60 million), but also indemnifies nuclear plant owners against claims of nuclear accident victims for up to $500 million per nuclear disaster. The act has the dual purpose of "protect[ing] the public ... and ... encourag[ing] the development of the atomic energy industry." 42 U.S.C. § 2012(i) (1970). Those indemnified are required to waive defenses otherwise available

holding Kansas' reinstitution of governmental immunity is of no help; no claim of discrimination between tort *victims* was involved in that case.

Finally, the State argues that, since it has the right to recreate sovereign immunity and abolish liability altogether, it must have the right to place limits on that liability. Although I agree that the State has the power to place limits on its liability, the State's attempt to apply this generalization to the facts of this case misconceives the nature of the evil present in I.C. § 6–926 and purpose of the means-focus standard of review. The wrong created by the statute is not the limitation on liability *per se,* but rather its effect when applied to tort victims as a class.

As the Washington court stated in *Jenkins v. State,* 85 Wash.2d 883, 540 P.2d 1363, 1367–68 (1975):

"Respondent relies heavily on the majority view in *Cook v. State,* 83 Wash.2d 599, 521 P.2d 725 (1974) that Washington has made only a limited and conditional waiver of sovereign immunity. Thus, respondent argues, the state is free to impose whatever conditions it pleases with respect to actions against the state or any of its political subdivisions, municipal corporations or quasi municipal corporations. However, this argument rests on the erroneous assumption that because a state may validly choose either to maintain or to waive its sovereign immunity protection, any conditions, however arbitrary, that may be imposed in the process are constitutional. In reality, sovereign immunity has nothing to do with the ultimate classifications which conditions establish. *Once sovereign immunity has been waived, even partially, any legislative classifications made with reference thereto will be constitutional only if they conform to the equal protection guarantees of the state and federal constitutions."* (Emphasis added.)

The means-focus standard of review mandates that where discrimination requiring application of the standard is present, the burden falls on the State to demonstrate a "fair and *substantial* relationship" between the purposes of the statute and the (admittedly discriminatory) means. This the State has not done.

The judgment on the verdict should be affirmed in its entirety and the order of the district court modifying the judgment should be set aside. In short, plaintiffs are entitled to prevail on their appeal and prevail also as respondents on all cross-appeals.

---

against nuclear accident victims. The Court applied a rational basis test to uphold the limitation. However, no argument was made or addressed in *Duke* that the scheme involved there discriminated against a class of tort victims—an argument which this Court has previously accepted. *See Jones,* 97 Idaho 859, 555 P.2d 399. *See also Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 830–31 (1980).